UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BEVERLY BANKS, ANGELA BRODRICK, TRACY BUSSELL, RANDALL CARTER, JAMES CRAIG, JOHN DAVIS, DENISE EMERY, BRENDA GILPATRICK, WILLIAM S. HENRY, KIMBERLY HOFFMAN, ROGER JACKSON, PAMELA LAZAROFF, STEPHEN LAZAROFF, NANCY PATERSON, ROBERTA PLATT, MICHELLE RONNE, KEVIN STONE, RODERICK VEAZEY, NICOLAS VENEZIA, VALARIE VENEZIA, CYNTHIA WHITES, and RICHARD XAVAR, individually and on behalf of all others similarly situated, | Case No. 3:23-CV-00779 <br><br> CLASS ACTION COMPLAINT <br><br> JURY TRIAL DEMANDED |
| *Plaintiffs,* | |
| v. | |
| AETNA INC., | |
| *Defendant.* | |

Plaintiffs Beverly Banks ("Plaintiff Banks"), Angela Brodrick ("Plaintiff Brodrick") Tracey Bussell ("Plaintiff Bussell"), Randall Carter ("Plaintiff Carter"), James Craig ("Plaintiff Craig"), John Davis ("Plaintiff Davis"), Denise Emery ("Plaintiff Emery"), Brenda Gilpatrick ("Plaintiff Gilpatrick"), William Henry ("Plaintiff Henry"), Kimberly Hoffman ("Plaintiff Hoffman"), Roger Jackson ("Plaintiff Jackson"), Pamela Lazaroff ("Plaintiff P. Lazaroff"), Stephen Lazaroff ("Plaintiff S. Lazaroff"), Nancy Paterson ("Plaintiff Paterson"), Robert Platt ("Plaintiff Platt"), Michelle Ronne ("Plaintiff Ronne"), Kevin Stone ("Plaintiff Stone"), Roderick Veazey ("Plaintiff Veazey"), Nicholas Venezia ("Plaintiff N. Venezia"), Valarie Venezia ("Plaintiff V. Venezia"), Cynthia Whites ("Plaintiff Whites") and Richard Xaver ("Plaintiff Xaver" and collectively with Plaintiffs Banks, Brodrick, Bussell, Carter, Craig, Davis,

Emery, Gilpatrick, Henry, Hoffman, Jackson, P. Lazaroff, S. Lazaroff, Paterson, Platt, Ronne, Stone, Veazey, N. Venezia, V. Venezia, and Whites, "Plaintiffs"), on behalf of themselves and all others similarly situated,[1] asserts the following against Aetna Inc., ("Aetna" or "Defendant"), based upon personal knowledge, where applicable, information and belief, and the investigation of counsel.

## INTRODUCTION

1.      Plaintiffs—Aetna Medicare Advantage plan holders—bring this class action against Defendant Aetna for its (i) failure to properly secure and safeguard highly valuable, protected personally identifiable information, including without limitation, names, addresses, emails, phone numbers, health plan account and ID numbers, date of birth, Medicare numbers, and private health information (collectively "Private Information"); (ii) failure to comply with industry standards to protect information systems that contain Private Information; (iii) unlawful disclosure of the Private Information of Plaintiffs and other members of the class; and (iv) failure to provide adequate notice to Plaintiffs and other members of the class that their Private Information had been disclosed and compromised.

2.      Aetna Inc. is a diversified health care benefits company based in Hartford, Connecticut. Aetna operates nationwide.

3.      Aetna serves employer groups, individuals, college students, part-time and hourly workers, health plans, health care providers, governmental units, government-sponsored plans, labor groups, and expatriates.

4.      Aetna provides a broad range of traditional, voluntary, and consumer-directed health insurance products and related services. These services include medical, pharmacy benefit

---

[1] Members of the Nationwide Class and the state subclasses defined below are referred to collectively herein as "Class Members".

management, dental, behavioral health, group life, long-term care, and disability plans, medical management capabilities – and most relevant here – Medicare plans.

5.     While providing these services, Aetna obtains, uses, and transmits the highly sensitive Private Information of its members, policyholders, clients, and/or customers.

6.     Aetna failed, however, to adequately safeguard this sensitive, valuable Private Information and, between January 28, 2023 and January 30, 2023, the Private Information of Plaintiffs and millions of other individuals was accessed and exfiltrated by an unauthorized third-party (the "Data Breach") from the servers of a vendor Aetna had selected and hired to perform services on its behalf: NationsBenefits.

7.     While the Data Breach occurred in January 2023, Plaintiffs did not receive any notice from any party, including Aetna, until April 27, 2023. Even then, Plaintiffs received a notice from the *vendor* and *not* Aetna. This delay deprived Plaintiffs and Class Members of the opportunity to take meaningful steps to mitigate the impact of the Data Breach.

8.     To date, upon information and belief, Aetna has not communicated with Plaintiffs and Class Members *at all* regarding the Data Breach.

9.     The value of Plaintiffs' and Class Members' stolen data, including Private Information, is recognized by many different constituencies. First, the value is recognized by Aetna itself. Second, the value is recognized by the cybercriminals who exfiltrated the Private Information for purposes of selling it to others who intend to commit identity theft and fraud. And third, the value is recognized by the individuals, themselves, including Plaintiffs and Class Members, whose Private Information was stolen.

10.    As a result, Plaintiffs and Class Members are at a substantially increased risk of identity theft, both currently and for the indefinite future. Plaintiffs' and Class Members' Private

Information—including their names linked with their dates of birth, health plan identification numbers, and Medicare identification numbers which were compromised by cyber criminals in the Data Breach—is highly valuable to bad actors who may seek to commit fraud and identity theft.

11.    Plaintiffs, on behalf of themselves and all others similarly situated, bring claims for negligence, negligence *per se*, breach of implied contract, unjust enrichment, breach of confidence, invasion of privacy— intrusion upon seclusion, violations of consumer protection statutes of their home states, violations of data protection statutes of their home states, and injunctive relief claims.

12.    Plaintiffs seek damages and injunctive relief requiring Aetna to, *inter alia,* (1) adopt reasonably sufficient practices to safeguard the Private Information in Aetna's custody and control; and (2) to properly evaluate and monitor data in the custody of third parties hired by Aetna to prevent incidents like the Data Breach from recurring more thoroughly properly and adequately.

13.    Given that information relating to the Data Breach remains exclusively in Aetna's control, Plaintiffs anticipate that additional information in support for their claims will emerge during discovery.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C § 1332(d), because the amount in controversy for the Class and Subclasses exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative Members of the Class and Subclass defined below, and a significant portion of putative Class and Subclass Members are citizens of a different state than Aetna.

15.     This Court has personal jurisdiction over Aetna because Aetna is a resident of the State of Connecticut.

16.     This Court also has specific personal jurisdiction over Aetna related to this action because Plaintiffs' claims arise out of Aetna's contact's business in this state and district.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant Aetna maintains its principal place of business in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## **PARTIES**

18.     Plaintiff Banks is a resident of Michigan. Plaintiff Banks received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Banks' information informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Banks' name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Banks faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Banks has been bombarded with spam, phishing attempts and inquiries for loans, health insurance and credit opportunities she did not request. Additionally, Plaintiff Banks has spent time monitoring her credit and screening her calls while asking potential callers to stop contacting her.

19.     Plaintiff Brodrick is a resident of Iowa. Plaintiff Brodrick received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Brodrick's information informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Brodrick's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare

number, Plaintiff Banks faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Brodrick has expended substantial time monitoring her accounts for fraudulent activity.

20.     Plaintiff Tracy Bussell is a resident of Illinois. Plaintiff Bussell received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Bussell's information informing him that his Private Information was compromised in the Data Breach.  As set forth below, because the Data Breach compromised Plaintiff Bussell's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Bussell faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Bussell has experienced a substantial increase in phishing attempts via telephone and has been forced to install software in an attempt mitigate this increase.

21.     Plaintiff Randall Carter is a resident of Oklahoma.  Plaintiff Carter received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Carter's information informing him that his Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Carter's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Carter faces a substantial and imminent risk of fraud and identity theft.

22.     Plaintiff Craig is a resident of Pennsylvania. Plaintiff Craig received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Craig's information informing him that his Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Craig's name,

address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Craig faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Craig has received multiple spam telephone calls each day from different phone numbers, always telling him that he qualifies for free medical equipment – and sometimes swearing at him – despite his number being on a do not call list.

23.     Plaintiff John Davis is a resident of Ohio.  Plaintiff Davis received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Davis' information informing him that his Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Davis's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Emery faces a substantial and imminent risk of fraud and identity theft.

24.     Plaintiff Denise Emery is a resident of Texas. Plaintiff Emery received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiffs Emery's information informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Emery's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Emery faces a substantial and imminent risk of fraud and identity theft.  Indeed, since the Data Breach occurred, Plaintiff Emery has experienced an increase in phishing attempts and spam texts and telephone calls.

25.     Plaintiff Brenda Gilpatrick is a resident of Georgia. Plaintiff Gilpatrick received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Gilpatrick's information informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised

Plaintiff Gilpatrick's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Gilpatrick faces a substantial and imminent risk of fraud and identity theft. Indeed, in the nearly three months since the Data Breahc, Plaintiff Gilpatrick has experienced a substantial increase in Medicare phishing and spam calls. As a self-employed professional that must answer each call, this time has taken her away from time she could otherwise devote to client matters. Additionally, Plaintiff Gilpatrick has expended time monitoring her credit reports.

26.   Plaintiff William Henry is a resident of Washington. Plaintiff Henry received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Henry's information informing him that his Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Henry's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Henry faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Henry has been notified by Experian that his email and password has been found on the dark web.

27.   Plaintiff Kimberly Hoffman is a resident of Illinois. Plaintiff Hoffman received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Hoffman's information informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Hoffman's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Hoffman faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Hoffman has had her

credit report accessed by unknown persons and has spent over 10 hours monitoring her accounts and signing up for a credit monitoring service.

28.     Plaintiff Roger Jackson is a resident of Connecticut. Plaintiff Jackson received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Jackson's information informing him that his Private Information was compromised in the Data Breach.  As set forth below, because the Data Breach compromised Plaintiff Jackson's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Jackson faces a substantial and imminent risk of fraud and identity theft.

29.     Plaintiff Pamela Lazaroff is a resident of Arkansas. Plaintiff P. Lazaroff received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff P. Lazaroff's information informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff P. Lazaroff's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff P. Lazaroff faces a substantial and imminent risk of fraud and identity theft.  Indeed, since the Data Breach occurred, Plaintiff P. Lazaroff has experienced an increase in phishing attempts and spam texts and telephone calls.

30.     Plaintiff Stephen Lazaroff is a resident of Arkansas. Plaintiff S. Lazaroff received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff S. LAzaroff's information informing him that his Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff S. Lazaroff's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff S. Lazaroff faces a substantial and imminent risk

of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff S. Lazaroff has experienced an increase in spam text messages, emails, and telephone calls.

31.     Plaintiff Nancy Paterson is a resident of California.  Plaintiff Peterson received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Paterson's information informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Paterson's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Platt faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Peterson has received a significant amount of spam emails and telephone calls.

32.     Plaintiff Roberta Platt is a resident of Massachusetts.  Plaintiff Platt received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Platt's information informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Platt's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Platt faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Platt has contacted all three credit bureaus to put a freeze alert on her account, as well as contacted other fraud and scam reporting divisions such as reportfraud.ftc.gov.

33.     Plaintiff Michelle Ronne is a resident of North Dakota. Plaintiff Ronne received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Ronne's information informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised

Plaintiff Ronne's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Stone faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Ronne has received numerous spam calls.  Additionally, someone tried to withdraw $500 from her bank account using PayPal.

34.     Plaintiff Kevin Stone is a resident of Texas. Plaintiff Stone received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Stone's information informing him that his Private Information was compromised in the Data Breach.  As set forth below, because the Data Breach compromised Plaintiff Stone's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Stone faces a substantial and imminent risk of fraud and identity theft.

35.     Plaintiff Roderick Veazey is a resident of Florida. Plaintiff Veazey received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Veazey's information informing him that his Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Veazey faces a substantial and imminent risk of fraud and identity theft. Indeed, since the data Breach occurred, Plaintiff Veazey was notified by a financial institution he is a customer of that his email and password had been compromised and appeared on the dark web.

36.     Plaintiff Nicholas Venezia is a resident of New York. Plaintiff N. Venezia received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff N. Venezia's information informing him that his Private Information

was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff N. Venezia's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff N. Venezia faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff N. Venezia has had a credit card opened in his wife's name and has experienced an increase in spam and phishing telephone calls and text messages.

37.    Plaintiff Valarie Venezia is a resident of New York. Plaintiff V. Venezia received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff V. Venezia's information informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff V. Venezia's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff V. Venezia faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff V. Venezia has had a credit card opened in her name and has devoted substantial time monitoring her credit.

38.    Plaintiff Cynthia Whites is a resident of Kansas. Plaintiff Whites received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Whites' information informing her that her Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Whites' name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Whites faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Whites has had credit accounts frozen multiple times due to suspicious activity and/or suspected fraud and has had to receive new credit cards as a result and has devoted substantial time monitoring her credit.

39.     Plaintiff Richard Xaver is a resident of Indiana. Plaintiff Xaver received a letter dated April 27, 2023, from a third-party vendor hired by Aetna and to whom Aetna provided Plaintiff Xaver's information informing him that his Private Information was compromised in the Data Breach. As set forth below, because the Data Breach compromised Plaintiff Xaver's name, address, phone number, date of birth, gender, health plan subscriber ID number, and/or Medicare number, Plaintiff Xaver faces a substantial and imminent risk of fraud and identity theft. Indeed, since the Data Breach occurred, Plaintiff Xaver has experienced an increase in spam emails and telephone calls, including calls alleging to be from Aetna.

40.     Aetna, Inc., ("Aetna") is Connecticut corporation with its principal place of business located at 151 Farmington Ave, Hartford, Connecticut 06156.

## FACTUAL ALLEGATIONS

## I.      AETNA COLLECTED, STORED, AND USED THE PERSONAL INFORMATION OF PLAINTIFFS AND MEMBERS OF THE CLASS

41.     Defendant Aetna, Inc., a subsidiary of CVS Health Corporation, is a leading provider of health insurance services in the United States. Aetna offers a range of healthcare products and services to employers, individuals, college students, and part-time and hourly workers nationwide.

42.     Aetna's health insurance offerings include medical, pharmacy, dental, behavioral health, group life, and disability plans, and several Medicare offerings, including Medicare Advantage.

43.     Aetna's Medicare Advantage plans are an alternative to Medicare Parts A and B, and often incorporate prescription drug coverage (Part D), as well as additional benefits not covered by Medicare such as vision, hearing, and dental care.

44.     Aetna also offers Medicare Supplement Insurance, or "Medigap" plans, which help cover some of the healthcare costs that Medicare doesn't pay, and standalone prescription drug (Part D) plans.

45.     In addition to its standard Medicare offerings, Aetna partners with NationsBenefits to provide certain benefits to Aetna Medicare Advantage members such as Plaintiffs and Class Members.

46.     Individuals such as Plaintiffs and Class Members which enroll with Aetna as Medicare Advantage members are required, by Aetna, to provide sensitive Personal Information.

## II.     **AETNA FORCED CUSTOMERS TO PROVIDE NATIONSBENEFITS WITH PRIVATE INFORMATION TO OBTAIN CERTAIN BENEFITS AND/OR SERVICES**

47.     Aetna outsources several Medicare Advantage benefits to third-party vendor providers rather than provide those benefits to Aetna members itself. One such third-party vendor provider Aetna sourced the provision of benefits to is NationsBenefits.

48.     In doing so, Aetna provided the Private Information of *millions* of Aetna customers to NationsBenefits without adequately reviewing and evaluating NationsBenefits' information technology security and systems.

49.     Worse, it appears that Aetna provided the information of Aetna customers to NationsBenefits before Aetna's customers attempted to use the programs offered by NationsBenefits, resulting in Aetna sharing the Private Information of Aetna members who never interacted with NationsBenefits at all.

50.     NationsBenefits describes itself as "a leading provider of supplemental benefits, flex cards, and member engagement solutions that partners with managed care organizations to

provide innovative healthcare solutions designed to drive growth, improve outcomes, reduce costs, and delight members."[2]

51.    NationsBenefits provides these services through a "comprehensive suite of innovative supplemental benefits, payments platform, and member engagement solutions [which] help health plans deliver high quality benefits to their members that help address social determinants of health and improve member health outcomes and satisfaction."[3]

52.    To use NationsBenefits' services, individuals such as Plaintiffs and members must provide NationsBenefits with sensitive Private Information, which NationsBenefits collects, stores, and uses to provide services.

53.    By making NationsBenefits the exclusive means through which Plaintiffs could obtain certain services, Aetna gave Plaintiffs and Class Members no choice but to provide a third-party (NationsBenefits) which, unbeknownst to Plaintiffs and Class Members, had inadequate security systems in place, with sensitive Private Information in order to receive the member benefits they are entitled to.

54.    As just one example, Aetna required its members such as Plaintiffs and Class Members to use the NationsBenefits OTC mobile app, which allows individuals to use their health insurance or benefit plans "to purchase medications, health and wellness items, and first-aid supplies with home delivery at no additional cost" using OTC benefit dollars:

---

[2] https://www.nationsbenefits.com/about-us
[3] https://www.nationsbenefits.com/about-us



55.     Aetna also required its members to use the NationsBenefits online portal:



56.    As shown in the screenshot above, use of these portals by individuals such as Plaintiffs and Class Members are required for them to obtain certain benefits, such as purchasing products online with plan benefit dollars ("This Portal is the *exclusive way* to order products online with your benefit dollars")(emphasis added):



---

4 https://aetna.nationsbenefits.com/login

57.     Plaintiffs and Class Members reasonably relied on Aetna to adequately review and evaluate the information technology security systems of vendors, such as NationsBenefits, that Aetna required Plaintiffs and Class Members to share their Private Information with.

58.     Plaintiffs and Class Members relied on Aetna to ensure that their Private Information provided to the vendors chosen by Aetna would remain confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

59.     Plaintiffs and Class Members relied on Aetna to ensure that their Private Information provided to the vendors chosen by Aetna Plaintiffs and Class Members also relied on NationsBenefits to ensure that NationsBenefits held vendors with whom NationsBenefits shared sensitive Private Information to the same high standards of data protection.

60.     Aetna had duties to ensure third-party vendors such as NationsBenefits adopted reasonable measures to protect the Private Information of Plaintiffs and Class Members from involuntary disclosure to third parties.

### III.    AETNA & NATIONSBENEFITS ALLOWED THE PERSONAL INFORMATION OF PLAINTIFFS AND MEMBERS OF THE CLASS TO BE COMPROMISED IN A DATA BREACH

61.     To provide the services outlined above and others NationsBenefits used, *inter alia,* software provided by third-party vendor Fortra, LLC ("Fortra") to transfer files containing the Private Information of Plaintiffs and Class Members.

62.     Unfortunately for Plaintiffs and Class Members, from January 28, 2023, through January 30, 2023, an unauthorized third-party hacker group began accessing and exfiltrating the

Private Information of Plaintiffs and Class Members via an exploit in the Fortra software (the "Data Breach").

63.     NationsBenefits and, upon information and belief, Aetna became aware of the Data Breach on February 7, 2023, yet Plaintiffs and Class Members were not notified of the Data Breach until April 27, 2023, when *NationsBenefits* (not Aetna) mailed out notification letters to individuals whose information had been compromised. Most individuals did not receive the letters until early May. This nearly three-month delay deprived Plaintiffs and Class Members of the ability to take steps to mitigate the damages caused by the Data Breach.

64.     Below are relevant excerpts from the letters sent to Aetna members whose information was compromised in the breach:[5]

> NationsBenefits Holding, LLC, and its affiliates and subsidiaries (collectively, "NationsBenefits" or "we"), provides benefits administration services to your health insurer, [client_name]. We place a high value on maintaining the privacy and security of the information we maintain for our health plan customers. Regrettably, this letter is to inform you that a vendor we used to exchange files with Aetna[6] was recently the victim of a cybersecurity attack, which impacted some of your personal information. We notified Aetna of this incident on February 9, 2023. This letter explains the incident, the measures we have taken in response and the steps you can take.

> What Happened? NationsBenefits used software provided by a third-party vendor, Fortra, LLC ("Fortra"), to securely exchange files with your health plan. On or around January 30, 2023, Fortra experienced a data security incident in which a malicious actor(s) accessed or acquired the data of multiple organizations, including NationsBenefits. When we learned of this incident on February 7, 2023, we immediately took steps to secure our systems and launched an investigation, which was conducted by an experienced outside law firm and a leading cybersecurity firm. As part of our investigation, NationsBenefits analyzed the impacted data to determine whether any individual's personal information was subject to unauthorized access or acquisition. On February 23, 2023, NationsBenefits confirmed that, unfortunately, some of your personal information was affected by the incident.

---

[5] Although this excerpt is from letters sent to Aetna members, letters sent to impacted individuals who are members and/or customers of other health insurers or managed care organization were substantially identical.
[6] https://www.hipaajournal.com/nationsbenefits-holdings-confirms-3-million-record-data-breach/; *see also* https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf

65.     NationsBenefits' filing with the U.S. Department of Health and Human Services ("HHS") and public reporting has revealed that the Private Information "3,037,303 health plan members, including, but not limited to, Aetna ACE, Elevance Health Flexible Benefit Plan, and UAW Retiree Medical Benefits Trust" was compromised in the Data breach and that "[t]he compromised information included: first and last name, address, phone number, date of birth, gender, health plan subscriber ID number, Social Security number, and/or Medicare number"[7]

66.     NationsBenefits' filing with the Office of the Maine Attorney General has further confirmed that the Private Information compromised in the Data Breach includes names and other personal identifiers in "in combination with" Social Security Number(s).[8]

## IV.     AETNA FAILED TO FULFILL ITS OBLIGATION TO PROTECT THE SENSITIVE PERSONAL INFORMATION OF PLAINTIFFS CLASS MEMBERS.

67.     Given the sensitive nature of the Private Information Plaintiffs and other Class Members entrusted to Aetna and Aetna forced them to provide to NationsBenefits, Aetna knew, or should have known, that hackers and cybercriminals would be able to commit identity theft, financial fraud, phishing, socially engineered attacks, healthcare fraud, and other identity-related fraud if they were able to exfiltrate that data from Aetna's or NationsBenefits' systems. Aetna knew that individuals whose Private Information was stored on their computer systems and those of the vendors Aetna selected would be reasonable in spending time and effort to mitigate their damages and prevent identity theft and fraud if that data were exfiltrated.

68.     Given that Aetna was on notice that it was maintaining highly valuable data, for which Aetna knew there was a risk that they would be targeted by cybercriminals and knew of

---

[7] https://www.hipaajournal.com/nationsbenefits-holdings-confirms-3-million-record-data-breach/
[8] https://apps.web.maine.gov/online/aeviewer/ME/40/764dec53-ed17-4732-9d8b-111239af9176.shtml

the extensive harm that would occur if Plaintiffs' and Class Members' Private Information was exposed through a Data Breach, Aetna owed a duty to safeguard that information.

69.     Because Plaintiffs and Class Members entrusted them with their Private Information, Aetna had a special relationship with Plaintiffs and Class Members, which provided an independent duty of care. Aetna owed a duty to use reasonable security measures because they undertook to collect, store and use customers' Private Information. In addition, Aetna had a duty to require and ensure that NationsBenefits would use reasonable security measures because it disclosed that same Private Information to NationsBenefits.

70.     Accordingly, Aetna is liable to Plaintiffs and the class for the compromise and unauthorized disclosure of Plaintiffs' and Class Members' Private Information.

### V.      AETNA FAILED TO COMPLY WITH REGULATORY AND INDUSTRY STANDARDS.

71.     Because of the value of Private Information to hackers and identity thieves, companies in the business of obtaining, storing, maintaining, and securing Private Information, such as Aetna, have been identified as being particularly vulnerable to cyber-attacks. Cybersecurity firms have promulgated a series of best practices that at minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.[9] Organizations, companies, and banks—like Aetna—have an added incentive to harden their networks against unauthorized

---

[9] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, Inc. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security/ [https://perma.cc/NY6X-TFUY].

penetration, because they directly control the data necessary to access consumers' financial accounts.

72.     Further, federal and state governments have likewise established security standards and issued recommendations to reduce the number and size of data breaches and the resulting harm to consumers and financial institutions. The FTC has issued numerous guides for businesses, highlighting the importance of reasonable data and cyber security practices. According to the FTC, the need for data and cyber security should be factored into all business decision-making.[10]

## A.  FTC GUIDANCE AND INDUSTRY STANDARDS

73.     Aetna is prohibited by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTC Act") from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

74.     In 2016, the FTC updated its publication, *Protecting Private Information: A Guide for Business*, which established guidelines for fundamental data and cyber security principles and practices for business.[11] The guidelines note businesses should protect the personal customer and consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.[12]

---

[10] *Start with Security: A Guide for Business* at 2, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.
[11] *Protecting Private Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business [https://perma.cc/9945-U4HV].
[12] *Id.*

The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[13]

75.     The FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and (most pertinent here) verify that third-party service providers have implemented reasonable security measures.

76.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

77.     Aetna also has obligations created by other federal and state laws and regulations, contracts, industry standards, and common law to maintain reasonable and appropriate physical, administrative, and technical measures to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

78.     Given the magnitude of the risk and repercussions of a data breach or attack targeting this type of data, the likelihood of a data breach or attack, and Aetna's explicit awareness of these vulnerabilities, Aetna should have taken every reasonable precaution in developing a robust security program and protecting Plaintiffs' and the Class Members' Private Information.

---

[13] *Id.*

79.    Yet, despite their duties, representations, and promises, Aetna failed to adequately secure and protect their customers' data, allowing the Plaintiffs' and Class Members' Private Information to be accessed, disclosed, and misused.

80.    Aetna also owed a duty to comply with industry standards in safeguarding Private Information, which—as discussed herein—they did not do.

81.    Cyberattacks have become so notorious that the FBI and Secret Service issued an unprecedented warning in 2019 to potential targets so they were aware of, and prepared for, a potential attack.[14]

82.    The U.S. government, various U.S. and international law enforcement agencies, cybersecurity industry groups and laboratories, and numerous industry trade groups have issued warnings and guidance on managing and mitigating phishing and ransomware threats. There are industry best practices for cybersecurity related to phishing and ransomware, some of which are particularly effective.

83.    For example, in 2019, both Microsoft and Google publicly reported that using multi-factor authentication ("MFA") blocks more than 99% of automated hacks, including most ransomware attacks that occur because of unauthorized account access. Likewise, the reputable SANS Software Security Institute issued a paper stating "[t]ime to implement multi-factor authentication!"[15] An example of MFA implementation is receiving a text with a code when you input your username and password into a website; even if a cybercriminal knew your username

---

[14] Kochman, *supra* n.171.
[15] Matt Bromiley, *Bye Passwords: New Ways to Authenticate* at 3, SANS Software Security Inst. (July 2019), https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE3y9UJ [https://perma.cc/ZSW9-QUEW]. Matt Bromiley, *Bye Passwords: New Ways to Authenticate* at 3, SANS Software Security Inst. (July 2019), https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE3y9UJ [https://perma.cc/ZSW9-QUEW].

and password, the cybercriminal would not be able to see the code on your phone and would thus be blocked from accessing your online account.

84.     In this regard, implementing MFA "can block over 99.9 percent of account compromise attacks."[16]

85.     Yet, instead of following these widely adopted industry standards, Aetna failed to adequately secure and protect their customers' data, allowing the Plaintiffs' and Class Members' Private Information to be accessed, disclosed, and misused.

## VI.     THE VALUE OF THE COMPROMISED PRIVATE INFORMATION AND EFFECTS OF UNAUTHORIZED DISCLOSURE.

86.     Aetna understands the protected Private Information it acquires, stores, and utilizes is highly sensitive and of significant value to the owners of the Private Information and those who would use it for wrongful purposes.

### A.   THE VALUE OF PRIVATE INFORMATION

87.     Private Information is property with inherent and sizeable market value. Its value is axiomatic, considering the market value and profitability of "Big Data" corporations in America. Alphabet Inc., the parent company of Google, aptly illustrated this in its 2020 Annual Report, when it reported a total annual revenue of $182.5 billion and net income of $40.2 billion.[17] $160.7 billion of this revenue was derived from its Google business, which is driven almost exclusively by leveraging the Private Information it collects about the users of its various free products and services. America's largest corporations profit almost exclusively through the use of Private Information illustrating the considerable market value of Private Information.

---

[16] *What Is Multi-Factor Authentication (MFA)?*, Consensus Techs. (Sept. 16, 2020), https://www.concensus.com/what-is-multi-factor-authentication/#:~:text=The%20proof%20 that%20MFA%20works,percent%20of%20account%20compromise%20attacks [https://perma.cc/RKT2-LX5Z].
[17] Alphabet Inc., Annual Report (Form 10-K) at 32 (Feb. 3, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001652044/000165204421000010/goog-20201231.htm.

88.     Criminal law also recognizes the value of Private Information and the serious nature of the theft of such an asset by imposing prison sentences. This strong deterrence is necessary because cybercriminals earn significant revenue through stealing Private Information. Once a cybercriminal has unlawfully acquired personal data, the criminal can demand a ransom or blackmail payment for its destruction, use the information to commit fraud or identity theft, or sell the Private Information to another cybercriminal on a thriving black market.

89.     Furthermore, Private Information is a valuable commodity to identity thieves, particularly when such data is aggregated in large numbers.  Former United States Attorney General William P. Barr made clear that consumers' sensitive personal information commonly stolen in data breaches "has economic value."  The purpose of stealing large caches of personal data is to use it to defraud individuals or to place it for illegal sale and to profit from other criminals who buy the data and use it to commit fraud and identity theft. Indeed, cybercriminals routinely post stolen personal information for sale on anonymous websites, making the information widely available to a criminal underworld.

90.     There is an active and robust market for this information. As John Sancenito, president of *Information Network Associates*, a company which helps companies with recovery after data breaches, explained after a data breach "[m]ost of the time what [data breach hackers] do is they steal the data and then they sell the data on the dark web to the people who actually commit the fraud."

91.     Thus, Plaintiffs and Class Members rightfully place a high value not only on their Private Information, but also on the privacy of that data.

92.     Once stolen, Private Information can be used in a number of different ways. One of the most common is that it is offered for sale on the "dark web," a heavily encrypted part of

the Internet that makes it difficult for authorities to detect the location or owners of a website. The dark web is not indexed by normal search engines such as Google and is only accessible using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling illegal items such as weapons, drugs, and Private Information. Websites appear and disappear quickly, making it a dynamic environment.

93.     The forms of Private Information involved in this Data Breach are particularly concerning. Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique Medicare ID numbers, health plan ID numbers, and Social Security numbers cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in a major inconvenience to the subject person, requiring a wholesale review of the person's relationships with government agencies and any number of private companies to update the person's accounts with those entities.

## B.  DATA BREACHES PUT CONSUMERS AT INCREASED RISK OF FRAUD AND IDENTIFY THEFT.

94.     Cyberattacks and data breaches of financial services companies are especially problematic because of the potentially permanent disruption they cause to the daily lives of their customers. Stories of identity theft and fraud abound, with hundreds of millions of dollars lost by everyday consumers every year as a result of internet-based identity theft attacks.[18]

95.     The U.S. Government Accountability Office ("GAO") released a report in 2007 regarding data breaches finding that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[19]

---

[18] Albert Khoury, *Scam alert: 5 most costly data breaches (plus 5 states most targeted)* (July 27, 2022), https://www.komando.com/security-privacy/most-costly-data-breaches/847800/
[19] *Private Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However,*

96.     The FTC recommends that identity theft victims take several steps to protect their

personal health and financial information after a data breach, including contacting one of the

credit bureaus to place a fraud alert (and to consider an extended fraud alert that lasts for seven

years if identity theft occurs), reviewing their credit reports, contacting companies to remove

fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their

credit reports.[20]

97.     Cybercriminals use stolen Private Information such as Social Security numbers

for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance

fraud.

98.     Identity thieves can also use Social Security numbers to obtain a driver's license

or other official identification card in the victim's name, but with the thief's picture; use the

victim's name and Social Security number to obtain government benefits; or file a fraudulent tax

return using the victim's information. In addition, identity thieves may obtain a job using the

victim's Social Security number, rent a house or receive medical services in the victim's name,

seek unemployment or other benefits, and may even give the victim's Private Information to

police during an arrest resulting in an arrest warrant being issued in the victim's name.

99.     A study by the Identity Theft Resource Center ("ITRC") found that 96.7% of

identity theft victims experienced costs and/or other harms from the criminal activity. [21] This

includes devastating results such as "I lost my home/place of residence" and "I couldn't care for

---

*the Full Extent Is Unknown* ("GAO Report") at 2, GAO (June 2007), https://www.gao.gov/assets/270/262899.pdf
[https://perma.cc/GCA5-WYA5].

[20] *Identity Theft Recovery Steps*, FTC, https://www.identitytheft.gov/Steps (last visited Mar. 23, 2021)
[https://perma.cc/ME45-5N3A].

[21] Jason Steele, *Credit Card and ID Theft Statistics*, Creditcards.com (updated Oct. 24, 2017),
https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php
[https://web.archive.org/web/20171215215318/https://www.creditcards.com/credit-card-news/credit-card-security-
id-theft-fraud-statistics-1276.php].

my family." Moreover, the harms of identity theft are not limited to the affected individual and

may adversely impact other associated persons and support systems, including government

assistance programs. In the ITRC study, nearly one third of survey respondents had to request

government assistance as a result of the identity theft, such as welfare, EBT, food stamps, or

similar support systems.[22] The ITRC study concludes that "identity theft victimization has an

extreme and adverse effect on each individual as well as all of the support systems and people

associated with the individual."[23]

100.    The Private Information exfiltrated in the Data Breach can also be used to commit

identity theft by placing Plaintiffs and Class Members at a higher risk of "phishing," "vishing,"

"smishing," and "pharming," which are other ways for cybercriminals to exploit information

they already have in order to get even more personally identifying information from a person

through unsolicited email, text messages, and telephone calls purportedly from a legitimate

company requesting personal, financial, and/or login credentials.

101.    Private Information is such a valuable commodity to identity thieves that once the

information has been compromised, criminals often trade the information on the cyber black

market for years.

102.    It must also be noted there may be a substantial time lag—measured in years—

between when harm occurs versus when it is discovered, and between when Private Information

and/or financial information is stolen and when it is used. According to the GAO, which

conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a
> year or more before being used to commit identity theft. Further, once stolen data have
> been sold or posted on the Web, fraudulent use of that information may continue for

---

[22] *Id.*
[23] *Id.*

years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[24]

103.    Private Information is such an inherently valuable commodity to identity thieves that, once compromised, criminals often trade the information on the cyber black-market for years.

104.    Furthermore, data breaches that expose any personal data, and in particular non-public data of any kind (*e.g.*, donation history or hospital records), directly and materially increase the chance that a potential victim is targeted by a spear phishing attack in the future, and spear phishing results in a high rate of identity theft, fraud, and extortion.[25]

105.    There is a strong probability that entire batches of stolen information from the Data Breach have yet to be made available on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Indeed, some of the Plaintiffs and many Class Members are in very early stages of their lives—in their twenties and thirties. Thus, as the respective Notices advise, Plaintiffs must vigilantly monitor their financial accounts for many years to come.

106.    Aetna is a highly sophisticated party that regularly handles sensitive Private Information, yet it failed to establish and/or implement appropriate administrative, technical and/or physical safeguards to ensure the security and confidentiality of Plaintiffs' and other Class Members' Private Information to protect against anticipated threats of intrusion of such information.

---

[24] GAO Report, *supra* n.**Error! Bookmark not defined.**, at 29.

[25] *See* Kelion & Tidy, *supra* n.**Error! Bookmark not defined.** (concluding that personal information such as "names, titles, telephone numbers, email addresses, mailing addresses, dates of birth, and, more importantly, donor information such as donation dates, donation amounts, giving capacity, philanthropic interests, and other donor profile information . . . . in the hands of fraudsters, [makes consumers] particularly susceptible to spear phishing—a fraudulent email to specific targets while purporting to be a trusted sender, with the aim of convincing victims to hand over information or money or infecting devices with malware").

107.    The ramifications of Aetna's failure to keep Plaintiffs' and Class Members' Private Information secure are long lasting and severe. To avoid detection, identity thieves often hold stolen data for months or years before using it. Also, the sale of stolen information on the "dark web" may take months or more to reach end-users, in part because the data is often sold in small batches as opposed to in bulk to a single buyer.  Thus, Plaintiffs and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

108.    Thus, Aetna knew, or should have known, the importance of safeguarding the Private Information entrusted to it and of the foreseeable consequences if its systems were breached.  Aetna failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

109.    Thus, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

## VII.    THE DATA BREACH DAMAGED PLAINTIFFS AND CLASS MEMBERS.

110.    As a result of Aetna's deficient security and monitoring measures, Plaintiffs and Class Members have been harmed by the compromise of their sensitive personal information, which is currently for sale on the dark web and through private sale to other cyber criminals and/or being used by criminals for identify theft and other fraud-related crimes.

111.    Plaintiffs and Class Members face a substantial and imminent risk of fraud and identity theft as their names have now been linked with their Social Security numbers, bank account numbers, emails, phone numbers, and physical addresses as a result of the Data Breach. These specific types of information are associated with a high risk of fraud.

112.    Plaintiffs and Class Members also suffered a "loss of value" of their sensitive personal information when it was stolen by hackers in the Data Breach. A robust market exists

for stolen personal information. Hackers sell personal information on the dark web—an underground market for illicit activity, including the purchase of hacked personal information—at specific identifiable prices. This market serves to determine the loss of value to Plaintiffs and Class Members.

113.    As discussed above, Plaintiffs' and Class Members' stolen personal information is a valuable commodity to identity thieves.

114.    Identity thieves can also combine data stolen in the Data Breach with other information about Plaintiffs and Class Members gathered from underground sources, public sources, or even Plaintiffs' and Class Members' social media accounts. Thieves can use the combined data to send highly targeted phishing emails to Plaintiffs and Class Members to obtain more sensitive information. Thieves can use the combined data to commit potential crimes, including opening new financial accounts in Plaintiffs' and Class Members' names, taking out loans in Plaintiffs' and Class Members' names, using Plaintiffs' and Class Members' information to obtain government benefits, filing fraudulent tax returns using Plaintiffs' and Class Members' information, obtaining Social Security numbers in Plaintiffs' and Class Members' names but with another person's photograph, and giving false information to police during an arrest.

115.    Plaintiffs and Class Members also suffered "benefit of the bargain" damages. Plaintiffs and Class Members overpaid for services that should have been—but were not—accompanied by adequate data security. Part of the interest and fees paid by Plaintiffs and Class Members to Aetna was intended to be used to fund adequate data security. Plaintiffs and Class Members did not get what they paid for.

116.     Plaintiffs and Class Members have spent and will continue to spend substantial amounts of time monitoring their accounts for identity theft and fraud, the opening of fraudulent accounts, disputing fraudulent transactions, and reviewing their financial affairs more closely than they otherwise would have done but for the Data Breach.

117.     Plaintiffs and Class Members may also incur out of pocket costs for protective measures such as identity theft protection, credit monitoring fees, credit report fees, credit freeze fees, fees for replacement cards, and similar costs related to the Data Breach.

118.     Class Members who experience actual identity theft and fraud will also be harmed by the inability to use their credit or debit cards when their accounts are suspended or otherwise rendered unusable due to fraudulent charges. To the extent Class Members are charged monthly/annual fees for their credit and/or debit accounts, they are left without the benefit of that bargain while they await receipt of their replacement cards. Class Members will be harmed further by the loss of rewards points or airline mileage that they cannot accrue while awaiting replacement cards. The inability to use payment cards may also result in missed payments on bills and loans, late charges and fees, and adverse effects on their credit, including decreased credit scores and adverse credit notations.

119.     In the case of a data breach, merely reimbursing a consumer for a financial loss due to identity theft or fraud does not make that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems."

120.     A victim whose personal information has been stolen or compromised may not see the full extent of identity theft or fraud until long after the initial breach. Additionally, a victim

whose personal information has been stolen may not become aware of charges when they are nominal, as typical fraud-prevention algorithms may not capture such charges. Those charges may be repeated, over and over again, on a victim's account.

121. The risk of identity theft and fraud will persist for years. Identity thieves often hold stolen data for months or years before using it to avoid detection. Also, the sale of stolen information on the dark web may take months or more to reach end-users, in part because the data is often sold in small batches to various individuals rather than in bulk to a single buyer. Thus, Plaintiffs and Class Members must vigilantly monitor their financial accounts *ad infinitum*.

## VIII.   AETNA'S FAILURE TO NOTIFY PLAINTIFFS AND CLASS MEMBERS IN A TIMELY OR ADEQUATE FASHION EXACERBATED THE DAMAGE.

122. As detailed above, Aetna has never directly notified Aetna Medicare Advantage members that their information has been compromised in the Data Breach. Moreover, while NationsBenefits has stated it learned of the Data Breach on February 7, 2023, NationsBenefits failed to even *begin* notifying Plaintiffs and Class Members until April 27, 2023, via U.S. Mail.

123. First, Aetna appears to have disavowed any duty to notify its members of the Data Breach, and instead deferred to NationsBenefits' decision to choose to notify individuals *only* via U.S. mail even though both Aetna and NationsBenefits possesses contact information for each and every customer it knows which is likely more effective at reaching those individuals than U.S. mail.

124. Second, the period of almost three months during which Aetna and NationsBenefits sat on the information could have been used by Plaintiffs and Class Members to take steps to mitigate the damage caused by the Data Breach.

125.    Instead, and to protect its own financial interests, Aetna and NationsBenefits concealed the Data Breach for almost three months, allowing the unauthorized third-party to potentially exploit Plaintiffs' and Class Members' Private Information without any mitigation steps being taken. Aetna did this despite *knowing that the information was in possession of had actors looking to exploit the Private Information for profit*, a fact Aetna knew shortly after discovery of the Data Breach.

126.    Plaintiffs and members of the classes were thus deprived of the opportunity to take any steps to prevent damage by NationsBenefits' concealment of the Data Breach and failure to provide timely and adequate notice of the Data Breach to Plaintiffs and Class Members.

## CLASS ACTION ALLEGATIONS

127.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following Nationwide Class:

> All Aetna customers whose Personal Information was compromised in the Data Breach made public by NationsBenefits in April 2023 (the "Nationwide Class" or the "Class").

128.    Plaintiffs reserve the right to modify, expand or amend the above Nationwide Class definition or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

## ARKANSAS SUBCLASS

129.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following Arkansas Subclass:

> All Aetna customers in Arkansas whose Personal Information was compromised in the Data Breach made public by NationsBenefits in April 2023 (the "Arkansas Subclass").

130.     Plaintiffs reserve the right to modify, expand or amend the above Arkansas

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## CALIFORNIA SUBCLASS

131.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following California Subclass:

> All Aetna customers in California whose Personal Information was compromised in the
> Data Breach made public NationsBenefits in April 2023 (the "California Subclass").

132.     Plaintiffs reserve the right to modify, expand or amend the above California

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## CONNECTICUT SUBCLASS

133.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Connecticut Subclass:

> All Aetna customers in Connecticut whose Personal Information was compromised in the
> Data Breach made public by NationsBenefits in April 2023 (the "Connecticut Subclass").

134.     Plaintiffs reserve the right to modify, expand or amend the above Connecticut

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## FLORIDA SUBCLASS

135.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Florida Subclass:

> All Aetna customers in Florida whose Personal Information was compromised in the
> Data Breach made public by NationsBenefits in April 2023 (the "Florida Subclass").

136.    Plaintiffs reserve the right to modify, expand or amend the above Florida Subclass definition or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

## GEORGIA SUBCLASS

137.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following Georgia Subclass:

> All Aetna customers in Georgia whose Personal Information was compromised in the Data Breach made public by NationsBenefits in April 2023 (the "Georgia Subclass").

138.    Plaintiffs reserve the right to modify, expand or amend the above Georgia Subclass definition or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

## ILLINOIS SUBCLASS

139.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following Illinois Subclass:

> All Aetna customers in Illinois whose Personal Information was compromised in the Data Breach made public by NationsBenefits in April 2023 (the "Illinois Subclass").

140.    Plaintiffs reserve the right to modify, expand or amend the above Illinois Subclass definition or to seek certification of a class or classes defined differently than above before any court determines whether certification is appropriate following discovery.

## INDIANA SUBCLASS

141.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and (b)(3) on behalf of the following Indiana Subclass:

> All Aetna customers in Indiana whose Personal Information was compromised in the Data Breach made public by NationsBenefits in April 2023 (the "Indiana Subclass").

142.     Plaintiffs reserve the right to modify, expand or amend the above Indiana

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## IOWA SUBCLASS

143.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Iowa Subclass:

> All Aetna customers in Iowa whose Personal Information was compromised in the Data Breach made public by NationsBenefits in April 2023 (the "Iowa Subclass").

144.     Plaintiff reserves the right to modify, expand or amend the above Iowa Subclass

definition or to seek certification of a class or classes defined differently than above before any

court determines whether certification is appropriate following discovery.

## KANSAS SUBCLASS

145.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Kansas Subclass:

> All Aetna customers in Kansas whose Personal Information was compromised in the Data Breach made public by NationsBenefits in April 2023 (the "Kansas Subclass").

146.     Plaintiffs reserve the right to modify, expand, or amend the above Kansas

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## MASSACHUSETTS SUBCLASS

147.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the Massachusetts Subclass:

> All Aetna customers in Massachusetts whose Personal Information was compromised in the Data Breach made public by NationsBenefits in April 2023 (the "Massachusetts Subclass").

148.    Plaintiffs reserve the right to modify, expand or amend the above Massachusetts

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## MICHIGAN SUBCLASS

149.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Michigan Subclass:

> All Aetna customers in Michigan whose Personal Information was compromised in the
> Data Breach made public by NationsBenefits in April 2023 (the "Michigan Subclass").

150.    Plaintiffs reserve the right to modify, expand or amend the above Michigan

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## NEW YORK SUBCLASS

151.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following New York Subclass:

> All Aetna customers in New York whose Personal Information was compromised in the
> Data Breach made public by NationsBenefits in April 2023 (the "New York Subclass").

152.    Plaintiffs reserve the right to modify, expand, or amend the above New York

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## NORTH DAKOTA SUBCLASS

153.    Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following North Dakota Subclass:

> All Aetna customers in North Dakota whose Personal Information was compromised in
> the Data Breach made public by NationsBenefits in April 2023 (the "North Dakota
> Subclass").

154.     Plaintiffs reserve the right to modify, expand, or amend the above North Dakota

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## OHIO SUBCLASS

155.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Ohio Subclass:

> All Aetna customers in Ohio whose Personal Information was compromised in the Data
> Breach made public by NationsBenefits in April 2023 (the "Ohio Subclass").

156.     Plaintiffs reserve the right to modify, expand, or amend the above Ohio Subclass

definition or to seek certification of a class or classes defined differently than above before any

court determines whether certification is appropriate following discovery.

## OKLAHOMA SUBCLASS

157.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Oklahoma Subclass:

> All Aetna customers in Oklahoma whose Personal Information was compromised in the
> Data Breach made public by NationsBenefits in April 2023 (the "Oklahoma Subclass").

158.     Plaintiffs reserve the right to modify, expand or amend the above Oklahoma

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## PENNSYLVANIA SUBCLASS

159.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Pennsylvania Subclass:

> All Aetna customers in Pennsylvania whose Personal Information was compromised in
> the Data Breach made public by NationsBenefits in April 2023 (the "Pennsylvania
> Subclass")

160.     Plaintiffs reserve the right to modify, expand or amend the above Pennsylvania

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

## TEXAS SUBCLASS

161.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Texas Subclass:

> All Aetna customers in Texas whose Personal Information was compromised in the Data
> Breach made public by NationsBenefits in April 2023 (the "Texas Subclass").

162.     Plaintiffs reserve the right to modify, expand or amend the above Texas Subclass

definition or to seek certification of a class or classes defined differently than above before any

court determines whether certification is appropriate following discovery.

## WASHINGTON SUBCLASS

163.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(a),

23(b)(2) and (b)(3) on behalf of the following Washington Subclass:

> All Aetna customers in Washington whose Personal Information was compromised in the
> Data Breach made public by NationsBenefits in April 2023 (the "Washington Subclass"
> and collectively with the Arkansas Subclass, California Subclass, Connecticut Subclass,
> Florida Subclass, Georgia Subclass, Illinois Subclass, Indiana Subclass, Iowa Subclass,
> Kansas Subclass, Massachusetts Subclass, Michigan Subclass, North Dakota Subclass,
> New York Subclass, Ohio Subclass, Oklahoma Subclass, Pennsylvania Subclass, and
> Texas Subclass, the "Subclasses").

164.     Plaintiffs reserve the right to modify, expand or amend the above Washington

Subclass definition or to seek certification of a class or classes defined differently than above

before any court determines whether certification is appropriate following discovery.

165.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because

all elements of Fed. R. Civ. P. 23(a) and (b)(2)-(3) are satisfied. Plaintiffs can prove the elements

of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

166. **Numerosity**. All requirements of Fed. R. Civ. P. 23(a)(1) are satisfied. The Members of the Nationwide Class and the State Subclasses are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While Plaintiffs are informed and believe that there are likely millions of Members of the Classes, the precise number of Class Members is unknown to Plaintiffs. Class Members may be identified through objective means. Class Members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

167. **Commonality and Predominance**. All requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) are satisfied. This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members, including, without limitation:

      a. Whether Aetna engaged in active misfeasance and misconduct alleged herein;

      b. Whether Aetna owed a duty to Class Members to safeguard their sensitive personal information;

      c. Whether Aetna breached its duty to Class Members to safeguard their sensitive personal information;

      d. Whether Aetna knew or should have known that its data security systems and monitoring processes were deficient;

e.  Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of the Data Breach;

f.  Whether Aetna's failure to provide adequate security proximately caused Plaintiffs' and Class Members' injuries; and

g.  Whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief.

168.  **Typicality.** All requirements of Fed. R. Civ. P. 23(a)(3) are satisfied. Plaintiffs' claims are typical of the claims of all Class and Subclass Members because Plaintiffs, like other Class and Subclass Members, suffered theft of their sensitive personal information in the Data Breach.

169.  **Adequacy of Representation.** All requirements of Fed. R. Civ. P. 23(a)(4) are satisfied. Plaintiffs are adequate Class representatives because they are Members of the Classes and State Subclasses and their interests do not conflict with the interests of other Class and Subclass Members that they seek to represent. Plaintiffs are committed to pursuing this matter for the Class with the Class's collective best interest in mind. Plaintiffs have retained counsel competent and experienced in complex class action litigation of this type and Plaintiffs intends to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the Class's interests.

170.  **Predominance and Superiority.** All requirements of Fed. R. Civ. P. 23(b)(3) are satisfied. As described above, common issues of law or fact predominate over individual issues. Resolution of those common issues in Plaintiffs' case will also resolve them for the Class's claims. In addition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered

in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Aetna, so it would be impracticable for Members of the Class to individually seek redress for Aetna's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

171.    **Cohesiveness**. All requirements of Fed. R. Civ. P. 23(b)(2) are satisfied. Aetna has acted, or refused to act, on grounds generally applicable to the Nationwide Class and Subclasses such that final declaratory or injunctive relief is appropriate.

172.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on newly learned facts or legal developments that arise following additional investigation, discovery, or otherwise.

### CLAIMS FOR RELIEF

### COUNT 1
### NEGLIGENCE
**(On behalf of the Nationwide Class, or alternatively, the Subclasses)**

173.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

174.    Aetna, as a service provider for Plaintiffs and Class Members, obtained Plaintiffs' and Class Members' Private Information from Plaintiffs and/or from Plaintiffs' health insurer or managed care organization.

175. By collecting and maintaining sensitive Private Information, Aetna had a common law duty of care to use reasonable means to secure and safeguard the sensitive personal information and to prevent disclosure of the information to unauthorized individuals. Aetna's duty included a responsibility to implement processes by which it could detect a data breach of this type and magnitude in a timely manner.

176. Aetna owed a duty of care to Plaintiffs and Class Members to provide data security consistent with the various statutory requirements, regulations, and other notices described above.

177. Aetna's duty of care arose as a result of, among other things, the special relationship that existed between Aetna and Plaintiffs and Class Members. Aetna was the only party in a position to ensure that its systems were sufficient to protect against the foreseeable risk that a data breach could occur that would result in substantial harm to consumers.

178. Aetna was subject to an "independent duty" untethered to any contract between Plaintiffs and Class Members and Aetna.

179. Aetna breached its duties, and thus was negligent, by failing to use reasonable measures to protect customers' sensitive personal information. Aetna's negligent acts and omissions include, but are not limited to, the following:

      a.  failure to employ systems and educate employees to protect against malware;

      b.  failure to comply with industry standards for software and server security;

      c.  failure to track and monitor access to its network and personal information;

      d.  failure to limit access to those with a valid purpose;

    e.   failure to adequately staff and fund its data security operation;

    f.   failure to remove, delete, or destroy highly sensitive personal information of consumers that is no longer being used for any valid business purpose;

    g.   failure to use due care in hiring, promoting, and supervising those responsible for its data security operations; and

    h.   failure to recognize that hackers were stealing personal information from its network while the Data Breach was taking place.

    i.   failure to oversee the entrustment of student loan borrowers' Private Information

180.    It was foreseeable to Aetna that a failure to use reasonable measures to protect its customers' sensitive personal information could result in injury to consumers. Further, actual and attempted breaches of data security were reasonably foreseeable to Aetna given the known frequency of data breaches and various warnings from industry experts.

181.    As a direct and proximate result of Aetna's negligence, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

182.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Aetna to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members.

**COUNT 2**
**NEGLIGENCE *PER SE***
**(On behalf of the Nationwide Class, or alternatively, the Subclasses)**

183.     Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

184.     Aetna, as a service provider for Plaintiffs and Class Members, obtained Plaintiffs' and Class Members' Private Information from Plaintiffs and/or from Plaintiffs' health insurer or managed care organization.

185.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Aetna for failing to use reasonable measures to protect Private Information. Various FTC publications and orders also form the basis of Aetna's duty.

186.     Aetna violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with the industry standards. Aetna's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and disclosed and the foreseeable consequences of a data breach.

187.     Plaintiffs and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

188.     Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against.  Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

189.     As a direct and proximate result of Aetna's negligence, Plaintiffs and Class Members have been injured as described herein and above, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

190.    Aetna's violation of Section 5 of the FTC Act constitutes negligence *per se*.

191.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Aetna to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members.

## COUNT 3
## BREACH OF IMPLIED CONTRACT
### (On behalf of the Nationwide Class, or alternatively, the Subclasses)

192.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

193.    When Plaintiffs and Class Members provided their sensitive personal information to Aetna in exchange for Aetna's services, they entered into implied contracts with Aetna under which Aetna agreed to take reasonable steps to protect their sensitive personal information.

194.    Aetna solicited and invited Plaintiffs and Class Members to provide their sensitive personal information as part of their regular business practices. Indeed, to sign up for a Aetna account—which is required to obtain certain benefits owed to Plaintiffs and Class Members as members, customers, and/or policyholders of their respective insurers or managed care organizations—Aetna requires customers to provide sensitive Private Information. Plaintiffs and Class Members accepted Aetna's offers and provided their sensitive personal information to Aetna.

195.    Plaintiffs and Class Members reasonably believed and expected that Aetna's data security practices complied with relevant laws, regulations, and industry standards when they entered into the implied contracts with Aetna.

48

196.    Plaintiffs and Class Members paid money (directly and/or indirectly) to Aetna and Plaintiffs and Class Members therefore reasonably believed and expected that Aetna would use part of those funds to obtain and oversee adequate data security. Aetna failed to do so.

197.    Plaintiffs and Class Members would not have provided their sensitive personal information to Aetna in the absence of Aetna's implied promise to keep their sensitive personal information reasonably secure.

198.    Plaintiffs and Class Members fully performed their obligations under the implied contracts by paying money to Aetna.

199.    Aetna breached its implied contracts with Plaintiffs and Class Members by failing to implement reasonable data security measures.

200.    As a direct and proximate result of Aetna's breaches of the implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

201.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Aetna to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; and (iii) provide free credit monitoring and identity theft insurance to all Class Members.

**COUNT 4**
**UNJUST ENRICHMENT**
**(On behalf of the Nationwide Class, or alternatively, the Subclasses)**

202.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

203.    Plaintiffs and Class Members conferred a monetary benefit upon Aetna in the form of monies paid while utilizing Aetna's services.

204.    Aetna appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members. Aetna also benefited from the receipt of Plaintiffs' and Class Members' sensitive personal information as this was utilized by Aetna to send bills and process payments for services, among other things.

205.    The monies Plaintiffs and Class Members paid to Aetna was supposed to be used by Aetna, in part, to pay for and oversee adequate data privacy infrastructure, practices, and procedures.

206.    Aetna's conduct caused Plaintiffs and Class Members to suffer actual damages in an amount equal to the difference in value between what they paid for (Aetna's services made with adequate data privacy and security practices and procedures), and what they actually received (Aetna's services without adequate data privacy and security practices and procedures).

207.    In equity and good conscience, Aetna should not be permitted to retain the money belonging to Plaintiffs and Class Members because Aetna failed to oversee, implement, or adequately implement, the data privacy and security practices and procedures that Plaintiffs and Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

208.    Aetna should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT 5
## BREACH OF CONFIDENCE
### (On behalf of the Nationwide Class, or alternatively, the Subclasses)

209.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

210.    Plaintiffs and Class Members maintained a confidential relationship with Aetna whereby Aetna undertook a duty not to disclose to unauthorized parties the Private Information provided by Plaintiffs and Class Members to Aetna to unauthorized third parties. Such Private Information was confidential and novel, highly personal and sensitive, and not generally known.

211.    Aetna knew Plaintiffs' and Class Members' Private Information was being disclosed in confidence and understood the confidence was to be maintained, including by expressly and implicitly agreeing to protect the confidentiality and security of the Private Information they collected, stored, and maintained.

212.    As a result of the Data Breach, there was an unauthorized disclosure of Plaintiffs' and Class Members' Private Information in violation of this understanding. The unauthorized disclosure occurred because Aetna failed to implement and maintain reasonable safeguards to protect the Private Information in its possession and failed to comply with industry-standard data security practices.

213.    Plaintiffs and Class Members were harmed by way of an unconsented disclosure of their confidential information to an unauthorized third party.

214.    But for Aetna's disclosure of Plaintiffs' and Class Members' Private Information in violation of the parties' understanding of confidence, their Private Information would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. Aetna's Data Breach was the direct and legal cause of the theft of Plaintiffs' and Class Members' Private Information, as well as the resulting damages. The injury and harm Plaintiffs and Class Members suffered was the reasonably foreseeable result of Aetna's unauthorized disclosure of Plaintiffs' and Class Members' Private Information. Aetna knew its computer systems and technologies for accepting, securing, and storing Plaintiffs' and Class Members' Private Information had serious

security vulnerabilities because Aetna failed to observe even basic information security practices or correct known security vulnerabilities.

215.     As a direct and proximate result of Aetna's breach of confidence, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen Private Information; illegal sale of the compromised Private Information on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the Private Information; lost value of access to their Private Information permitted by Aetna; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Aetna's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

## COUNT 6
### INVASION OF PRIVACY – INTRUSION UPON SECLUSION
**(On behalf of the Nationwide Class, or alternatively, the Subclasses)**

216.     Plaintiffs re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

217.   Plaintiffs shared Private Information with Aetna that Plaintiffs wanted to remain private and non-public.

218.   Plaintiffs reasonably expected that the Private Information they shared with Aetna would be protected and secured against access by unauthorized parties and would not be disclosed to or obtained by unauthorized parties or disclosed or obtained for any improper purpose.

219.   Aetna intentionally intruded into Plaintiffs' and Class Members' seclusion by disclosing without permission their Private Information to a third party who then sold their Private Information to other third parties on the dark web.

220.   By failing to keep Plaintiffs' and Class Members' Private Information secure, and disclosing Private Information to unauthorized parties for unauthorized use, Aetna unlawfully invaded Plaintiffs' and Class Members' privacy right to seclusion by, inter alia:

      a.   intruding into their private affairs in a manner that would be highly offensive to a reasonable person;

      b.   invading their privacy by improperly using their Private Information properly obtained for specific purpose for another purpose, or disclosing it to unauthorized persons;

      c.   failing to adequately secure their Private Information from disclosure to unauthorized persons; and

      d.   enabling the disclosure of their Private Information without consent.

221.   The Private Information that was publicized during the Data Breach was highly sensitive, private, and confidential, as it included Social Security numbers and other Private Information.

222.    Aetna's intrusions into Plaintiffs' and Class Members' seclusion were substantial and would be highly offensive to a reasonable person, constituting an egregious breach of social norms.

223.    As a direct and proximate result of Aetna's invasions of privacy, Plaintiffs and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen Private Information; illegal sale of the compromised Private Information on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports, among other related activities; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the Private Information; lost value of access to their Private Information permitted by Aetna; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of Aetna's Data Breach; lost benefit of their bargains and overcharges for services or products; nominal and general damages; and other economic and non-economic harm.

## COUNT 7
### ARKANSAS DECEPTIVE TRADE PRACTICES ACT,
### A.C.A. §§ 4-88-101, *et seq.*
**(On behalf of Plaintiff P. Lazaroff, Plaintiff S. Lazaroff and the Arkansas Subclass)**

224.    Plaintiff P. Lazaroff and Plaintiff S. Lazaroff, individually, and on behalf of the Arkansas Subclass, repeats and realleges all allegations as if fully set forth herein.

225.    Aetna's products and services are "goods" and "services" as defined by A.C.A. §§ 4-88-102(4) and (7).

226.    Aetna advertised, offered, or sold goods or services in Arkansas and engaged in trade or commerce directly or indirectly affecting the people of Arkansas.

227.    The Arkansas Deceptive Trade Practices Act ("ADTPA"), A.C.A. §§ 4-88-101, et seq., prohibits unfair, deceptive, false, and unconscionable trade practices.

228.    Aetna engaged in acts of deception and false pretense in connection with the sale and advertisement of services in violation of A.C.A. § 4-88-1-8(1) and concealment, suppression and omission of material facts, with intent that others rely upon the concealment, suppression or omission in violation of A.C.A. § 4-88-1-8(2), and engaged in the following deceptive and unconscionable trade practices defined in A.C.A. § 4-88-107:

    a. Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model;

    b. Advertising the services with the intent not to sell them as advertised;

    c. Employing bait-and-switch advertising consisting of an attractive but insincere offer to sell a product or service which the seller in truth does not intend or desire to sell;

    d. Knowingly taking advantage of a consumer who is reasonably unable to protect his or her interest;

    e. Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade.

229.    Aetna's unconscionable, false, and deceptive acts and practices include:

a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff P. Lazaroff and Plaintiff S. Lazaroff's and the Arkansas Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b.  Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff P. Lazaroff and Plaintiff S. Lazaroff's and the Arkansas Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Lazaroff's and the Arkansas Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff P. Lazaroff and Plaintiff S. Lazaroff's and the Arkansas Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.   Omitting, suppressing, and concealing the material fact that it did not

reasonably or adequately secure Plaintiff P. Lazaroff and Plaintiff S.

Lazaroff's and the Arkansas Subclass Members' Private Information; and

230.   Omitting, suppressing, and concealing the material fact that they did not comply

with common law and statutory duties pertaining to the security and privacy of Plaintiff P.

Lazaroff and Plaintiff S. Lazaroff's and the Arkansas Subclass Members' Private Information,

including duties imposed by the FTC Act, 15 U.S.C. § 45.

231.   Aetna's representations and omissions were material because they were likely to

deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect

the confidentiality of consumers' PII.

232.   Aetna intended to mislead Plaintiff P. Lazaroff, Plaintiff S. Lazaroff and the

Arkansas Subclass Members and induce them to rely on its misrepresentations and omissions.

233.   Had Aetna disclosed to Plaintiff P. Lazaroff, Plaintiff S. Lazaroff and the

Arkansas Subclass Members that its data systems were not secure and, thus, vulnerable to attack,

Aetna would have been unable to continue in business and it would have been forced to adopt

reasonable data security measures and comply with the law. Aetna was trusted with sensitive and

valuable Private Information regarding millions of consumers, including Plaintiff P. Lazaroff,

Plaintiff S. Lazaroff and the Arkansas Subclass Members. Aetna accepted the responsibility of

protecting the data while keeping the inadequate state of its security controls secret from the

public. Accordingly, Plaintiff P. Lazaroff, Plaintiff S. Lazaroff and the Arkansas Subclass

Members acted reasonably in relying on Aetna's misrepresentations and omissions, the truth of

which they could not have discovered.

234.     Aetna acted intentionally, knowingly, and maliciously to violate Arkansas's Deceptive Trade Practices Act, and recklessly disregarded Plaintiff P. Lazaroff, S. Lazaroff's and the Arkansas Subclass Members' rights. Aetna's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

235.     As a direct and proximate result of Aetna's unconscionable, unfair, and deceptive acts or practices and Plaintiff and the Arkansas Subclass Members' reliance thereon, Plaintiff P. Lazaroff, Plaintiff S. Lazaroff and the Arkansas Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Aetna's services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

236.     Plaintiff P. Lazaroff, Plaintiff S. Lazaroff and the Arkansas Subclass Members seek all monetary and non-monetary relief allowed by law, including actual financial losses; injunctive relief; and reasonable attorneys' fees and costs.

## COUNT 8
### CALIFORNIA UNFAIR COMPETITON LAW
#### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
#### (On behalf of Plaintiff Paterson and the California Subclass)

237.     Plaintiff Paterson, on behalf of the California Subclass, re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

238.     Plaintiff Paterson and members of the California Subclass are residents of California.

239.     Aetna is a "person" as defined by Cal. Bus. & Prof. Code §17201.

240.     Aetna violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

241.     Aetna's unlawful, unfair, and deceptive acts and practices include:

a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Paterson's and members of the California Subclass' sensitive personal information, directly and proximately causing the Data Breach, and omitting, suppressing, and concealing the material fact of that failure;

b.   Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following well-publicized cybersecurity incidents, directly and proximate causing the Data Breach, and omitting, suppressing, and concealing the material fact of that failure;

c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Paterson's and members of the California Subclass' sensitive personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45 which was a direct and proximate cause of the Data Breach and omitting, suppressing, and concealing the material fact of that failure;

d.   Misrepresenting that it would protect the privacy and confidentiality of Plaintiff Paterson's and members of the California Subclass' sensitive personal information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Paterson's and members of the California Subclass' sensitive personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Paterson's and members of the California Subclass' sensitive personal information; and

g.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Paterson's and members of the California Subclass' sensitive personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

242.    Aetna's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect the confidentiality of consumers' sensitive personal information.

243.    As a direct and proximate result of Aetna's unfair, unlawful, and fraudulent acts and practices, Plaintiff Paterson's and members of the California Subclass' were injured and lost money or property, including the premiums and/or price received by Aetna for its goods and services; the loss of the benefit of their bargain with Aetna, as they would not have paid Aetna for goods and services or would have paid less for such goods and services but for Aetna's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; wasted time and expenses related to monitoring

their financial accounts for fraudulent activity; loss of value of their sensitive personal information; and an increased, imminent risk of fraud and identity theft.

244.    Plaintiff Paterson and members of the California Subclass seek all monetary and non-monetary relief allowed by law, including compensatory damages; restitution; disgorgement; punitive damages; injunctive relief; and reasonable attorneys' fees and costs.

**COUNT 9**
**CALIFORNIA CONSUMER LEGAL REMEMDIES ACT**
**Cal. Civ. Code §§1750, *et seq.***
**(On behalf of Plaintiff Paterson and the California Subclass)**

245.    Plaintiff Paterson and the members of the California Subclass re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

246.    Plaintiff Paterson and members of the California Subclass are residents of California.

247.    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA") is a comprehensive statutory scheme to protect consumers against unfair and deceptive business practices in connection with the conduct of businesses providing goods, property or services to consumers primarily for personal, family, or household use.

248.    Aetna is a "person" as defined by Civil Code §§ 1761(c) and 1770 and has provided "services" as defined by Civil Code §§ 1761(b) and 1770.

249.    Civil Code section 1770, subdivision (a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

250.    Civil Code section 1770, subdivision (a)(7) prohibits one who is involved in a transaction from "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another."

251.    Plaintiff Paterson and each member of the California Subclass are "consumers" as defined by Civil Code §§ 1761(d) and 1770 and have engaged in a "transaction" as defined by Civil Code §§ 1761(e) and 1770.

252.    Aetna's acts and practices were intended to and did result in the sale of products and services to Plaintiff Paterson and the members of the California Subclass in violation of Civil Code § 1770, including, but not limited to, the following:

      a.   misrepresenting that its services would include reasonable security measures designed to protect the privacy and confidentiality of Plaintiff Paterson's and members of the California Subclass' sensitive personal information;

      b.   misrepresenting that it would supply its services in conformity with its common law and statutory duties pertaining to the security and privacy of Plaintiff Paterson's and members of the California Subclass' sensitive personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

      c.   omitting, suppressing, and concealing the material fact that in connection with providing its services it did not reasonably or adequately secure Plaintiff Paterson's and members of the California Subclass' sensitive personal information; and

      d.   omitting, suppressing, and concealing the material fact that in connection with providing its services it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff

Paterson's and members of the California Subclass' sensitive personal information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

253.    Aetna's representations and omissions were material because they were likely to and did deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect the confidentiality of customers' sensitive personal information.

254.    Had Aetna disclosed to Plaintiff Paterson and members of the California Subclass that its data systems were not secure and, thus, vulnerable to attack, Aetna would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Instead, Aetna received, maintained, and compiled Plaintiff Paterson's and members of the California Subclass' sensitive personal information as part of the services Aetna provided and for which Plaintiff Paterson and members of the California Subclass paid without advising Plaintiff Paterson and members of the California Subclass that Aetna's data security practices were insufficient to maintain the safety and confidentiality of Plaintiff Paterson and members of the California Subclass' sensitive personal information. Accordingly, Plaintiff Paterson and the members of the California Subclass acted reasonably in relying on Aetna's misrepresentations and omissions, the truth of which they could not have discovered.

255.    As a direct and proximate result of Aetna's violations of California Civil Code § 1770, Plaintiff Paterson and members of the California Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Aetna as they would not have paid Aetna for goods and services or would have paid less for such goods and services but for Aetna's violations alleged herein; losses from fraud and identity theft; costs for credit

monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their sensitive personal information; and an increased, imminent risk of fraud and identity theft.

256.    Plaintiff Paterson, individually and on behalf of the California Subclass, seek an injunction requiring Defendant to adopt reasonable and sufficient data security measures designed to protect and secure Plaintiff Paterson's and the members of the California Subclass' sensitive personal information.

257.    Pursuant to Cal. Civ. Code § 1782(a), Plaintiffs served Defendants with notice of their alleged violations of the CLRA by certified mail return receipt requested. If, within thirty days after the date of such notification, Defendants fail to provide appropriate relief for their violations of the CLRA, Plaintiffs will amend this Complaint to seek monetary damages.

**COUNT 10**
**CALIFORNIA CONSUMER PRIVACY ACT**
**Cal. Civ. Cde §§1798.100, *et seq.***
**(On behalf of Plaintiff Paterson and the California Subclass)**

258.    Plaintiff Paterson, individually and on behalf of the California Subclass re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

259.    California's Consumer Privacy Act ("CCPA") was recently enacted to protect consumers' personal information from collection and use by businesses without appropriate notice and consent.

260.    Cal. Civ. Code § 1798.150(a)(1) provides that "any consumer whose nonencrypted and nonredacted personal information . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the

information to protect the personal information" may commence a civil action for any of the following:

     a. Damages, not less than $100 and not greater than $750 per consumer per incident, or actual damages, whichever is greater;

     b. Injunctive or declaratory relief; and

     c. Any other relief the Court deems proper.

261. Plaintiff Paterson and members of the California Subclass provided Aetna with nonencrypted and nonredacted personal information, as defined in Cal. Civ. Code § 1798.81.5(d).

262. As alleged herein, Plaintiff Paterson's and members of the California Subclass' nonencrypted and nonredacted personal information was subject to unauthorized access, exfiltration, theft, and disclosure, when it was stolen by cyber criminals as a result of the Data Breach caused by Aetna.

263. The unauthorized access, exfiltration, theft, and disclosure, of Plaintiff Paterson's and members of the California Subclass' sensitive personal information was a direct result of Aetna's failure to implement and maintain reasonable security procedures appropriate to the nature of the information they stored and collected.

264. As a direct and proximate result of Aetna's violations of the CCPA, Plaintiff Paterson and members of the California Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including loss of the benefit of their bargain with Aetna, as they would not have paid Aetna for goods and services or would have paid less for such goods and services but for Aetna's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and

identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; loss of value of their personal information; and an increased, imminent risk of fraud and identity theft.

265.    Plaintiff Paterson, individually and on behalf of the California Subclass, seek an injunction requiring Defendant to adopt reasonable and sufficient data security measures designed to protect and secure Plaintiff Paterson's and the members of the California Subclass' sensitive personal information, as well as actual damages on behalf themselves and the Subclass.

266.    Pursuant to Cal. Civ. Code § 1798.150(b), Plaintiffs served Defendants with notice of the specific provisions of the CCPA Defendants have violated by certified mail return receipt requested. If, within thirty days after the date of such notification, Defendants fail to provide appropriate relief for their violations of the CCPA, Plaintiffs will amend this Complaint to seek statutory damages on behalf of themselves and the Subclass.

## COUNT 11
### CONNECTICUT UNFAIR TRADE PRACTICES ACT
#### Conn. Gen. Stat. Ann. §§ 42-110a *et seq.*
#### (On behalf of Plaintiff Jackson and the Connecticut Subclass)

267.    Plaintiff Jackson individually, and on behalf of the Connecticut Subclass, repeats and realleges all allegations as if fully set forth herein.

268.    Aetna is a "person" as defined by Conn. Gen. Stat. Ann. § 42-110(a)(3).

269.    Plaintiff Jackson and Connecticut Subclass Members are actual or potential consumers of Aetna's services.

270.    At all times mentioned herein, Aetna engages in "trade" or "commerce" in Connecticut as defined by Conn. Gen. Stat. Ann. § 42-110(a)(4), in that they engaged in the

"advertising," "sale," and "distribution" of any "goods," "services," "property," "articles,"
"commodities," or "things of value" in Connecticut.

271.    The Connecticut Unfair Trade Practices Act (CUTPA) provides that "[n]o person
shall engage in unfair methods of competition and unfair or deceptive acts or practices in the
conduct of any trade or commerce." C.G.S.A. § 42-110b(a).

272.    For the reasons discussed herein, Aetna violated CUTPA by engaging in the
herein described deceptive or unfair acts or practices proscribed by § 42-110a *et seq.* Aetna's
acts and practices, including its material omissions, described herein, were likely to, and did in
fact, deceive and mislead Members of the public, including consumers acting reasonably under
the circumstances, to their detriment.

273.    Aetna engaged in deceptive trade practices in the course of its business, in
violation of CUTPA, including:

> a.   Making a false representation as to the characteristics of products and
>       services;
>
> b.   Representing that services are of a particular standard, quality, or grade,
>       though Aetna knew or should have known that there were or another;
>
> c.   Advertising services with intent not to sell them as advertised;
>
> d.   Employing "bait and switch" advertising, which is advertising
>       accompanied by an effort to sell goods, services, or property other than
>       those advertised or on terms other than those advertised; and
>
> e.   Failing to disclose material information concerning its services which was
>       known at the time of an advertisement or sale when the failure to disclose

the information was intended to induce the consumer to enter into the

transaction.

274.    Aetna's deceptive trade practices include:

    a.    Failing to implement and maintain reasonable security and privacy

measures to protect Plaintiff Jackson's and Connecticut Subclass

Members' Private Information, which was a direct and proximate cause of

the Data Breach;

    b.    Failing to identify and remediate foreseeable security and privacy risks

and adequately improve security and privacy measures despite knowing

the risk of cybersecurity incidents, which was a direct and proximate cause

of the Data Breach;

    c.    Failing to comply with common law and statutory duties pertaining to the

security and privacy of Plaintiff Jackson's and Connecticut Subclass

Members' Private Information, including duties imposed by the FTC Act,

15 U.S.C. § 45, which was a direct and proximate cause of the Data

Breach;

    d.    Misrepresenting that they would protect the privacy and confidentiality of

Plaintiff Jackson's and Connecticut Subclass Members' Private

Information, including by implementing and maintaining reasonable

security measures;

    e.    Misrepresenting that they would comply with common law and statutory

duties pertaining to the security and privacy of Plaintiff Jackson's and

Connecticut Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Jackson's and Connecticut Subclass Members' Private Information; and

g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Jackson's and Connecticut Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

275.   Aetna's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect the confidentiality of consumers' Private Information.

276.   Aetna intended to mislead Plaintiff Jackson and Connecticut Subclass Members and induce them to rely on its misrepresentations and omissions.

277.   Had Aetna disclosed to Plaintiff Jackson and the Connecticut Subclass that its data systems were not secure and, thus, vulnerable to attack, Aetna would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Aetna was trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff Jackson and the Connecticut Subclass. Aetna accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff Jackson and the Connecticut

Subclass Members acted reasonably in relying on Aetna's misrepresentations and omissions, the truth of which they could not have discovered.

278.    Aetna acted intentionally, knowingly, and maliciously to violate CUTPA, and recklessly disregarded Plaintiff Jackson and Connecticut Subclass Members' rights. Aetna's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

279.    As a direct and proximate result of Aetna's deceptive trade practices, Plaintiff Jackson and the Connecticut Subclass suffered injuries to their legally protected interests, including their legally protected interest in the confidentiality and privacy of their Private Information, monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Aetna's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Data Breach.

280.    Aetna's deceptive trade practices significantly impact the public, because many Members of the public are actual or potential consumers of Aetna's services and the Data Breach affected millions of Americans, which include Members of the Colorado Subclass.

281.    Plaintiff Jackson and the Connecticut Subclass seek relief for the injuries they have suffered as a result of Aetna's unfair and deceptive acts and practices, as provided by C.G.S.A. § 42-110g and applicable law.

## COUNT 12
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### Fla. Stat. §§ 501.201, *et seq.*
### (On behalf of Plaintiff Veazey and the Florida Subclass)

282.    Plaintiff Veazey, individually and on behalf of the Florida Subclass, repeats and realleges the allegations above as if fully set forth herein.

283.    Plaintiff Veazey and Florida Subclass Members are "consumers" as defined by Fla. Stat. § 501.203.

284.    Aetna advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly or indirectly affecting the people of Florida.

285.    Aetna engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. § 501.204(1), including:

> a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Veazey's and Florida Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;
>
> b.  Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;
>
> c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Veazey's and Florida Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Florida's data security statute, F.S.A. § 501.171(2), which was a direct and proximate cause of the Data Breach;

d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Veazey's and Florida Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Veazey's and Florida Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Florida's data security statute, F.S.A. § 501.171(2);

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Veazey's and Florida Subclass Members' Private Information; and

g.  Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Veazey's and Florida Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Florida's data security statute, F.S.A. § 501.171(2).

286.    Aetna's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect the confidentiality of consumers' Private Information.

287.    Had Aetna disclosed to Plaintiffs and Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Aetna would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Aetna was trusted with sensitive and valuable Private Information regarding

millions of consumers, including Plaintiffs and the Subclass. Aetna accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiffs and the Subclass Members acted reasonably in relying on Aetna's misrepresentations and omissions, the truth of which they could not have discovered.

288.    As a direct and proximate result of Aetna's unconscionable, unfair, and deceptive acts and practices, Plaintiff Veazey and Florida Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Aetna's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

289.    Plaintiff Veazey and Florida Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages under Fla. Stat. § 501.211; declaratory and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any other relief that is just and proper.

## <u>COUNT 13</u>
### GEORGIA FAIR BUSINESS PRACTICES ACT, O.C.G.A. §§ 10-1-399, *et seq.*
### (On Behalf of Plaintiff Gilpatrick and Georgia Subclass)

290.    Plaintiff Gilpatrick, individually and on behalf of the Georgia Subclass, repeats and realleges all preceding allegations as if fully set forth herein.

291.    Aetna, Plaintiffs, and Class members are "persons" within the meaning of the Georgia Fair Business Practices Act ("GFBPA"). O.C.G.A. § 10-1- 399(a).

292.     Aetna is engaged in, and its acts and omissions affect, trade and commerce under O.C.G.A. § 10-1-392(28). Further, Aetna is engaged in "consumer acts or practices," which are defined as "acts or practices intended to encourage consumer transactions" under O.C.G.A. § 10-1-392(7).

293.     Aetna engaged in "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" in violation of

294.     O.C.G.A. § 10-1-393(a). Those acts and practices include those expressly declared unlawful by O.C.G.A. § 10-1-393(b), such as:

> a.  Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;
>
> b.  Representing that goods or services are of a particular standard, quality, or grade if they are of another; and
>
> c.  Advertising goods or services with intent not to sell them as advertised.

295.     In addition, Aetna engaged in the unfair and deceptive acts and practices described below that, while not expressly declared unlawful by O.C.G.A. § 10-1-393(b), are prohibited by O.C.G.A. § 10-1-393(a).

296.     In the course of its business, Aetna engaged in unfair acts and practices prohibited by O.C.G.A. § 10-1-393(a), including:

> a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Gilpatrick's and the Georgia Subclass' Private Information, which was a direct and proximate cause of the Data Breach;

b.  Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Gilpatrick's and the Georgia Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

297.    In the course of its business, Aetna also engaged in deceptive acts and practices prohibited by O.C.G.A. § 10-1-393(a), including:

a.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Gilpatrick's and the Georgia Subclass' Private Information, including by implementing and maintaining reasonable security measures;

b.  Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Gilpatrick's and the Georgia Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

c.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Gilpatrick's and the Georgia Subclass' Private Information; and

d.  Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security

and privacy of Plaintiff Gilpatrick's and the Georgia Subclass' Private

Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

298.    The misrepresentations and omissions described in the preceding paragraph were

material and made intentionally and knowingly with the intent that Plaintiff Gilpatrick and the

Georgia Subclass rely upon them in connection with providing to Aetna their extremely sensitive

and valuable Private Information.

299.    Aetna knew of the inadequate security controls and vulnerabilities in its data

security systems storing Plaintiff Gilpatrick's and the Georgia Subclass' sensitive and valuable

Private Information but concealed all of these security failings.

300.    Aetna's deceptive acts and practices were likely to and did in fact deceive the

public at large and reasonable consumers, including Plaintiff Gilpatrick and the Georgia

Subclass, regarding the security and safety of the Private Information in its care, including the

Private Information of Plaintiff Gilpatrick and the Georgia Subclass.

301.    Aetna knew or should have known that by collecting, selling, and trafficking in

Private Information, Plaintiff Gilpatrick and the Georgia Subclass would reasonably rely upon

and assume Aetna's data systems were secure unless Aetna otherwise informed them.

302.    Plaintiff Gilpatrick and the Georgia Subclass had no effective means on their own

to discover the truth. Aetna did not afford Plaintiff Gilpatrick and the Georgia Subclass any

opportunity to inspect Aetan's data security, learn that it was inadequate and non-compliant with

legal requirements, or otherwise ascertain the truthfulness of Aetna's representations and

omissions regarding Aetna's ability to protect data and comply with the law.

303.    Plaintiff Gilpatrick and the Georgia Subclass relied to their detriment upon

Aetna's representations and omissions regarding data security, including Aetna's failure to alert

customers that its privacy and security protections were inadequate and insecure and thus were vulnerable to attack.

304.    Had Aetna disclosed to Plaintiff Gilpatrick and the Georgia Subclass that its data systems were not secure and, thus, vulnerable to attack, Aetna would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Aetna was trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff Gilpatrick and the Georgia Subclass. Aetna accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff Gilpatrick and the Georgia Subclass acted reasonably in relying on Aetna's misrepresentations and omissions, the truth of which they could not have discovered.

305.    Aetna acted intentionally, knowingly, and maliciously to violate the GFBPA, and recklessly disregarded Plaintiff Gilpatrick's and the Georgia Subclass' rights.

306.    Aetna's violations present a continuing risk to Plaintiff Gilpatrick and the Georgia Subclass, as well as to the general public.

307.    Aetna's unlawful acts and practices complained of herein affect the consumer marketplace and the public interest, including the millions of U.S residents and many Georgians affected by the Aetna Data Breach.

308.    But for Aetna's violations of the GFBPA described above, the Aetna Data Breach would not have occurred.

309.    As a direct and proximate result of Aetna's violations of the GFBPA, Plaintiff Gilpatrick and the Georgia Subclass have suffered injury-in-fact, monetary, and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and

expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Aetna's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

310.    The GFBPA permits any person who suffers injury or damages as a result of the violation of its provisions to bring an action against the person or persons engaged in such violations. O.C.G.A. § 10-1-399(a).

311.    Plaintiff Gilpatrick and the Georgia Subclass bring this action on behalf of themselves and the Georgia Subclass for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers and the public at large to make informed decisions related to the security of their sensitive Private Information, and to protect the public from Aetna's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices.

312.    Plaintiff Gilpatrick and the Georgia Subclass are entitled to a judgment against Aetna for actual and consequential damages; general, nominal, exemplary, and trebled damages and attorneys' fees pursuant to the GFBPA; costs; and such other further relief as the Court deems just and proper.

## COUNT 14
### GEORGIA UNIFORM DECEPTIVE PRACTICES ACT,
### O.C.G.A. §§ 10-1-370, *et seq.*
### (On Behalf of Plaintiff Gilpatrick and Georgia Subclass)

313.    Plaintiff Gilpatrick, individually and on behalf of the Georgia Subclass, repeats and realleges all preceding allegations as if fully set forth herein.

314.     Aetna, Plaintiff Gilpatrick, and each member of the Georgia Subclass are "persons" within the meaning of § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA").

315.     Aetna engaged in deceptive trade practices in the conduct of its business, in violation of O.C.G.A. § 10-1-372(a), including:

    a.   Representing that goods or services have characteristics that they do not have;

    b.   Representing that goods or services are of a particular standard, quality, or grade if they are of another;

    c.   Advertising goods or services with intent not to sell them as advertised; and

    d.   Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

316.     Aetna's deceptive acts and practices include:

    a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Gilpatrick's and the Georgia Subclass' Private Information, which was a direct and proximate cause of the Data Breach;

    b.   Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Gilpatrick's and the Georgia Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Gilpatrick's and the Georgia Subclass' Private Information, including by implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Gilpatrick's and the Georgia Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Gilpatrick's and the Georgia Subclass' Private Information; and

g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Gilpatrick's and the Georgia Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

317. Aetna's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect the confidentiality of consumers' Private Information.

318. Aetna intended to mislead Plaintiff and the Georgia Subclass and induce them to rely on its misrepresentations and omissions.

319.     In the course of its business, Aetna engaged in activities with a tendency or capacity to deceive.

320.     Aetna acted intentionally, knowingly, and maliciously to violate Georgia's Uniform Deceptive Trade Practices Act, and recklessly disregarded Plaintiff Gilpatrick's and the Georgia Subclass' rights. Aetna's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

321.     Had Aetna disclosed to Plaintiff Gilpatrick and the Georgia Subclass that its data systems were not secure and, thus, vulnerable to attack, Aetna would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Aetna was trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff and the Subclass. Aetna accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff Gilpatrick and the Georgia Subclass acted reasonably in relying on Aetna's misrepresentations and omissions, the truth of which they could not have discovered.

322.     As a direct and proximate result of Aetna's deceptive trade practices, Plaintiff Gilpatrick and the Georgia Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Aetna's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

323.     Plaintiff Gilpatrick and the Georgia Subclass seek all relief allowed by law, including injunctive relief, and reasonable attorneys' fees and costs, under O.C.G.A. § 10-1-373.

## COUNT 15
### ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
#### 815l. Comp. Stat. §§ 510/2, *et seq.*
#### (On behalf of Plaintiff Bussell and Plaintiff Hoffman and the Illinois Subclass)

324.     Plaintiff Bussell and Plaintiff Hoffman, individually and on behalf of the Illinois Subclass, repeats and realleges all preceding allegations as if fully set forth herein.

325.     Aetna is a "person" as defined by 815 Ill. Comp. Stat. §§ 510/1(5).

326.     Aetna engaged in deceptive trade practices in the conduct of its business, in violation of 815 Ill. Comp. Stat. §§ 510/2(a), including:

   a.   Representing that goods or services have characteristics that they do not have;

   b.   Representing that goods or services are of a particular standard, quality, or grade if they are of another;

   c.   Advertising goods or services with intent not to sell them as advertised; and

   d.   Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

327.     Aetna's deceptive acts and practices include:

   a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Bussell and Plaintiff Hoffman's and Illinois Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b.   Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Bussell and Plaintiff Hoffman's and Illinois Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a), which was a direct and proximate cause of the Data Breach;

d.   Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Bussell and Plaintiff Hoffman's and Illinois Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Bussell and Plaintiff Hoffman's and Illinois Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a);

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Bussell and Plaintiff Hoffman's and Illinois Subclass Members' Private Information; and

g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Bussell and Plaintiff Hoffman's and Illinois Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, Illinois laws regulating the use and disclosure of Social Security Numbers, 815 Ill. Comp. Stat § 505/2RR, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. § 510/2(a).

328.   Aetna's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect the confidentiality of consumers' Private Information.

329.   The above unfair and deceptive practices and acts by Aetna were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Bussell, Plaintiff Hoffman and Illinois Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

330.   As a direct and proximate result of Aetna's unfair, unlawful, and deceptive trade practices, Plaintiff Bussell, Plaintiff Hoffman and Illinois Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment

for Aetna's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

331.    Plaintiff Bussell, Plaintiff Hoffman and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief and reasonable attorney's fees.

**COUNT 16**
**INDIANA DECEPTIVE CONSUMER SALES ACT**
**Ind. Code §§ 24-5-0.5-1, *et seq.***
**(On behalf of Plaintiff Xaver and the Indiana Subclass)**

332.    Plaintiff Xaver individually and on behalf of the Indiana Subclass, repeats and realleges all allegations as if fully set forth herein.

333.    Defendant is a "person" as defined by Ind. Code § 24-5-0.5-2(a)(2).

334.    Defendant is a "supplier" as defined by § 24-5-0.5-2(a)(1), because it regularly engages in or solicits "consumer transactions," within the meaning of § 24-5-0.5-2(a)(3)(A).

335.    Defendant engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions, in violation of Ind. Code § 24-5-0.5-3(a).

336.    Defendant's representations and omissions include both implicit and explicit representations, including:

337.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Xaver's and the Indiana Subclass' Private Information, which was a direct and proximate cause of the Data Breach;

338.    Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

339.     Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Xaver's and the Indiana Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

340.     Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Xaver's and the Indiana Subclass' Private Information, including by implementing and maintaining reasonable security measures;

341.     Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Xaver's and the Indiana Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

342.     Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Xaver's and the Indiana Subclass' Private Information; and

343.     Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Xaver's and the Indiana Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

344.     Defendant's acts and practices were "unfair" because they caused or were likely to cause substantial injury to consumers which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

345.     The injury to consumers from Defendant's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury and an unwarranted risk to the safety of their Private Information or the security of their identity or credit. The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented

number of consumers, but also because it inflicted a significant amount of harm on each consumer.

346.     Consumers could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the inadequacy of its data security, Defendant created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

347.     Defendant's inadequate data security had no countervailing benefit to consumers or to competition.

348.     Defendant's acts and practices were "abusive" for numerous reasons, including:

a.  Because they materially interfered with consumers' ability to understand a term or condition in a consumer transaction. Defendant's failure to disclose the inadequacies in its data security interfered with consumers' decision-making in a variety of their transactions.

b.  Because they took unreasonable advantage of consumers' lack of understanding about the material risks, costs, or conditions of a consumer transaction. Without knowing about the inadequacies in Defendant's data security, consumers lacked an understanding of the material risks and costs of a variety of their transactions.

c.  Because they took unreasonable advantage of consumers' inability to protect their own interests. Consumers could not protect their interests due to the asymmetry in information between them and Defendant concerning

the state of Defendant security, and because it is functionally impossible for consumers to obtain credit without their Private Information being in Defendant's systems.

d. Because Defendant took unreasonable advantage of consumers' reasonable reliance that it was acting in their interests to secure their data. Consumers' reliance was reasonable for the reasons discussed below.

349.    Defendant also engaged in "deceptive" acts and practices in violation of Indiana Code § 24-5-0.5-3(a) and § 24-5-0.5-3(b), including:

a. Misrepresenting that the subject of a consumer transaction has performance, characteristics, or benefits it does not have which the supplier knows or should reasonably know it does not have;

b. Misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not; and

c. Misrepresenting that the subject of a consumer transaction will be supplied to the public in greater quantity (i.e., more data security) than the supplier intends or reasonably expects.

350.    Defendant intended to mislead Plaintiff Xaver and Indiana Subclass Members and induce them to rely on its misrepresentations and omissions.

351.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

352.     Had Defendant disclosed to Plaintiff Xaver and Indiana Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant was trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff Xaver and the Indiana Subclass. Defendant accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff Xaver and Indiana Subclass Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

353.     Defendant had a duty to disclose the above-described facts due to the circumstances of this case, the sensitivity and extensivity of the Private Information in its possession, and the generally accepted professional standards. This duty arose due to the representations and relationship between Defendant and Plaintiff Xaver and the Indiana Subclass as described herein. In addition, such a duty is implied by law due to the nature of the relationship between consumers-including Plaintiff Xaver and the Indiana Subclass-and Defendant, because consumers are unable to fully protect their interests with regard to their data, and placed trust and confidence in Defendant. Defendant's duty to disclose also arose from its:

    a.  Possession of exclusive knowledge regarding the security of the data in its systems;

    b.  Active concealment of the state of its security; and/or

    c.  Incomplete representations about the security and integrity of its computer and data systems, and its prior data breaches, while purposefully

withholding material facts from Plaintiff Xaver and the Indiana Subclass that contradicted these representations.

354.    Defendant acted intentionally, knowingly, and maliciously to violate Indiana's Deceptive Consumer Sales Act, and recklessly disregarded Plaintiff Xaver's and the Indiana Subclass' rights. Defendant's actions were not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.

355.    Defendant's conduct includes incurable deceptive acts that Defendant engaged in as part of a scheme, artifice, or device with intent to defraud or mislead, under Ind. Code § 24-5-0.5-2(a)(8). As a direct and proximate result of Defendant's uncured or incurable unfair, abusive, and deceptive acts or practices, Plaintiff Xaver and Indiana Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Defendant's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

356.    Defendant's violations present a continuing risk to Plaintiff Xaver and Indiana Subclass Members as well as to the public.

357.    Plaintiff Xaver and Indiana Subclass Members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $500 for each non-willful violation; the greater of treble damages or $1,000 for each willful violation; restitution; reasonable attorneys' fees and costs; injunctive relief; and punitive damages.

<u>COUNT 17</u>
**PERSONAL INFORMATION SECURITY BREACH PROTECTION LAW**
**Iowa Code § 715C.2**
**(On behalf of Plaintiff Brodrick and the Iowa Subclass)**

358.    Plaintiff Brodrick individually and on behalf of the Iowa Subclass, repeats and realleges the allegations all allegations as if fully set forth herein.

359.    Aetna is a business that owns or licenses computerized data that includes personal information, as defined by Iowa Code § 715C.2(1).

360.    Plaintiff Brodrick's and Iowa Subclass Members' includes PII as covered under Iowa Code § 715C.2(1).

361.    Aetna is required to accurately notify Plaintiff Brodrick and Iowa Subclass Members if it becomes aware of a breach of its data security system in the most expeditious time possible and without unreasonable delay under Iowa Code § 715C.2(1).

362.    Because Aetna was aware of a breach of its security system, Aetna had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Iowa Code § 715C.2(1).

363.    By failing to disclose the Aetna Data Breach in a timely and accurate manner, Aetna violated Iowa Code § 715C.2(1).

364.    Pursuant to Iowa Code § 715C.2(9), a violation of Iowa Code § 715C.2(1) is an unlawful practice pursuant to Iowa Code Ann. § 714.16(7).

365.    As a direct and proximate result of Aetna's violations of Iowa Code § 715C.2(1), Plaintiff Brodrick and Iowa Subclass Members suffered damages, as described above.

366.    Plaintiff Brodrick and Iowa Subclass Members seek relief under Iowa Code § 714.16(7), including actual damages and injunctive relief.

## COUNT 18
## IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT
### Iowa Code § 714H
### (On behalf of Plaintiff Brodrick and the Iowa Subclass)

367. Plaintiff Brodrick individually and on behalf of the Iowa Subclass, repeats and realleges the allegations all allegations as if fully set forth herein.

368. Aetna is a "person" as defined by Iowa Code § 714H.2(7).

369. Plaintiff Brodrick and Iowa Subclass Members are "consumers" as defined by Iowa Code § 714H.2(3).

370. Aetna's conduct described herein related to the "sale" or "advertisement" of "merchandise" as defined by Iowa Code §§ 714H.2(2), (6), & (8).

371. Aetna engaged in unfair, deceptive, and unconscionable trade practices, in violation of the Iowa Private Right of Action for Consumer Frauds Act, including:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Brodrick's and Iowa Subclass Members' PII, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Brodrick's and Iowa Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.   Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Brodrick's and Iowa Subclass Members' PII, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Brodrick's and Iowa Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Brodrick's and Iowa Subclass Members' PII; and

g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Brodrick's and Iowa Subclass Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45.

372.   Aetna's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect the confidentiality of consumers' PII.

373.   Aetna intended to mislead Plaintiff Brodrick and Iowa Subclass Members and induce them to rely on its misrepresentations and omissions.

374.   Aetna acted intentionally, knowingly, and maliciously to violate Iowa's Private Right of Action for Consumer Frauds Act, and recklessly disregarded Plaintiff Brodrick's and Iowa Subclass Members' rights. Aetna's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

375.    As a direct and proximate result of Aetna's unfair, deceptive, and unconscionable conduct, Plaintiff Brodrick and Iowa Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Aetna's services; loss of the value of access to their PII; and the value of identity protection services made necessary by the Breach.

376.    Plaintiff Brodrick has provided the requisite notice to the Iowa Attorney General, the office of which approved the filing of this class action lawsuit pursuant to Iowa Code § 714H.7.

377.    Plaintiff Brodrick and Iowa Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, damages, punitive damages, and reasonable attorneys' fees and costs.

### COUNT 19
**PROTECTION OF CONSUMER INFORMATION**
**Kan. Stat. Ann. §§ 50-7a02(a), *et seq.***
**(On behalf of Plaintiff Whites and the Kansas Subclass)**

378.    Plaintiff Whites individually, and on behalf of the Kansas Subclass, repeats and realleges all allegations as if fully set forth herein.

379.    Defendant is a business that owns or licenses computerized data that includes Private Information as defined by Kan. Stat. Ann. § 50-7a02(a).

380.    Plaintiff Whites' and the Kansas Subclass' Private Information is covered under Kan. Stat. Ann. § 50-7a02(a).

381.    Defendant is required to accurately notify Plaintiffs and the Kansas Subclass if it becomes aware of a breach of its data security system that was reasonably likely to have caused misuse of Plaintiff Whites' and the Kansas Subclass' Private Information, in the most expedient time possible and without unreasonable delay under Kan. Stat. Ann. § 50-7a02(a).

382.    Because Defendant was aware of a breach of its security system that was reasonably likely to have caused misuse of Plaintiffs' and the Kansas Subclass' Private Information, Defendant had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Kan. Stat. Ann. § 50-7a02(a).

383.    By failing to disclose the Data Breach in a timely and accurate manner, Defendant violated Kan. Stat. Ann. § 50-7a02(a).

384.    As a direct and proximate result of Defendant's violations of Kan. Stat. Ann. § 50-7a02(a), Plaintiff Whites and the Kansas Subclass suffered damages, as described above.

385.    Plaintiff Whites and the Kansas Subclass seek relief under Kan. Stat. Ann. § 50-7a02(g), including equitable relief.

## COUNT 20
### KANSAS CONSUMER PROTECTION ACT
### K.S.A. §§ 50-623, *et seq.*
### (On behalf of Plaintiff Whites and the Kansas Subclass)

386.    Plaintiff Whites individually, and on behalf of the Kansas Subclass, repeats and realleges all allegations as if fully set forth herein.

387.     K.S.A. §§ 50-623, *et seq.* is to be liberally construed to protect consumers from suppliers who commit deceptive and unconscionable practices.

388.    Plaintiff Whites and the Kansas Subclass are "consumers" as defined by K.S.A. § 50-624(b).

389.     The acts and practices described herein are "consumer transactions," as defined by K.S.A. § 50-624(c).

390.     Defendant is a "supplier" as defined by K.S.A. § 50-624(l).

391.     Defendant advertised, offered, or sold goods or services in Kansas and engaged in trade or commerce directly or indirectly affecting the people of Kansas.

392.     Defendant engaged in deceptive and unfair acts or practices, including:

    a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs Whites' and the Kansas Subclass' Private Information, which was a direct and proximate cause of the Data Breach;

    b.  Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Whites' and the Kansas Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, And Kansas's identity fraud statute, the Wayne Owen Act, K.S.A. § 50-6,139b, which was a direct and proximate cause of the Data Breach;

    d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs Whites' and the Kansas Subclass' Private Information, including by implementing and maintaining reasonable security measures;

    e.  Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass

Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, Kansas's identity fraud statute, the Wayne Owen Act, K.S.A. § 50-6,139b;

 f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs Whites' and the Kansas Subclass' Private Information; and

 g. Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Whites' and the Kansas Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Kansas's identity fraud statute, the Wayne Owen Act, K.S.A. § 50-6,139b. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs Whites' and the Kansas Subclass' Private Information, which was a direct and proximate cause of the Data Breach;

393. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

394. Defendant intended to mislead Plaintiff and the Kansas Subclass and induce them to rely on its misrepresentations and omissions.

395. Had Defendant disclosed to Plaintiff Whites and the Kansas Subclass that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant was trusted with sensitive and valuable Private Information

regarding millions of consumers, including Plaintiff Whites and the Kansas Subclass. Defendant accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff Whites and the Kansas Subclass acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

396.    Defendant also engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of K.S.A. § 50-627, including knowingly taking advantage of the inability of Plaintiff Whites and the Kansas Subclass to reasonably protect their interests, due to their lack of knowledge (see K.S.A. § 50-627(b)(1)).

397.    Plaintiff Whites and the Kansas Subclass had unequal bargaining power with respect to their ability to control the security and confidentiality of their Private Information in Defendant's possession.

398.    The above unfair, deceptive, and unconscionable practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff Whites and the Kansas Subclass that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

399.    Defendant acted intentionally, knowingly, and maliciously to violate Kansas's Consumer Protection Act, and recklessly disregarded Plaintiff Whites' and the Kansas Subclass' rights. Defendant's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

400.    As a direct and proximate result of Defendant's unfair, deceptive, and unconscionable trade practices, Plaintiff Whites and the Kansas Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-

monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Defendant's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

401.    Plaintiff Whites and the Kansas Subclass seek all monetary and non-monetary relief allowed by law, including civil penalties or actual damages (whichever is greater), under K.S.A. §§ 50-634 and 50-636; injunctive relief; and reasonable attorneys' fees and costs.

### COUNT 21
### MASSACHUSETTS CONSUMER PROTECTION ACT
### Mass. Gen. Laws Ann. Ch. 93A, §§ 1, *et seq.*
### (On behalf of Plaintiff Platt and the Massachusetts Subclass)

402.    Plaintiff Platt individually, and on behalf of the Massachusetts Subclass, repeats and realleges all allegations as if fully set forth herein.

403.    Defendant is a "person" as defined by Mass. Gen. Laws ch. 93A, § 1(a).

404.    Defendant engaged in unfair and deceptive acts or practices in the conduct of trade or commerce, in violation of Mass. Gen. Laws ch. 93A, § 2(a).

405.    Defendant's representations and omissions include both implicit and explicit representations.

406.    Defendant's unfair and deceptive acts or practices include, but are not limited to:

    a.  Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Platt's and Massachusetts Subclass' Private Information, which was a direct and proximate cause of the Data Breach;

b.   Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Platt's and Massachusetts Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

d.   Misrepresenting that they would protect the privacy and confidentiality of Plaintiff and the Massachusetts Subclass' Private Information, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Platt's and the Massachusetts Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.   Omitting, suppressing, and concealing the material fact that they did not reasonably or adequately secure Plaintiff Platt's and the Massachusetts Subclass' Private Information; and

g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Platt's and the Massachusetts Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

407.   Defendant's acts and practices were unfair because they caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

408.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers, including Plaintiff Platt and the Massachusetts Subclass, that their Private Information was not exposed and misled Plaintiff Platt and the Massachusetts Subclass into believing they did not need to take actions to secure their identities.

409.    The injury to consumers from Defendant's conduct was and is substantial because it involved a monetary injury and an unwarranted risk to the safety of their Private Information or the security of their identity or credit. The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

410.    Consumers could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers about the inadequacy of their data security programs, Defendant created an asymmetry of information between them and consumers that precluded consumers from taking action to avoid or mitigate injury.

411.    Defendant's inadequate data security measures were not outweighed by any countervailing benefits to consumers or to competition. Defendant's business practices did not promote, nor were they essential to, efficiency, innovation, or any other legitimate business interest.

412.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff Platt and the Massachusetts Subclass have suffered injury in fact, including but not limited to, the loss of their Private Information, increased risk of identity theft, credit and reputational harm, and financial losses as a result of the Data Breach.

413.    Plaintiff Platt and the Massachusetts Subclass seek actual damages, multiple damages, attorneys' fees, costs, and any other just and proper relief available under Mass. Gen. Laws ch. 93A, §§ 9 and 11, resulting from Defendant's violation of Mass. Gen. Laws ch. 93A, § 2(a).

**COUNT 22**
**MICHIGAN IDENTITY THEFT PROTECTION ACT,**
**Mich. Comp. Laws Ann. §§ 445.72, *et seq.***
**(On behalf of Plaintiff Banks and the Michigan Subclass)**

414.    Plaintiff Banks, individually, and on behalf of the Michigan Subclass, repeats and realleges all allegations as if fully set forth herein.

415.    Aetna is a business that owns or licenses computerized data that includes Private Information as defined by Mich. Comp. Laws Ann. § 445.72(1).

416.    Plaintiff Banks's and Michigan Subclass Members' Private Information (for the purpose of this count, "Private Information"), (e.g., Social Security numbers) includes Private Information as covered under Mich. Comp. Laws Ann. § 445.72(1).

417.    Aetna is required to accurately notify Plaintiff Banks and Michigan Subclass Members if it discovers a security breach or receives notice of a security breach (where unencrypted and unredacted Private Information was accessed or acquired by unauthorized persons), without unreasonable delay under Mich. Comp. Laws Ann. § 445.72(1).

418.    Because Aetna discovered a security breach and had notice of a security breach (where unencrypted and unredacted Private Information was accessed or acquired by unauthorized persons), Aetna had an obligation to disclose the Aetna data breach in a timely and accurate fashion as mandated by Mich. Comp. Laws Ann. § 445.72(4).

419.    By failing to disclose the Aetna data breach in a timely and accurate manner, Aetna violated Mich. Comp. Laws Ann. § 445.72(4).

420.    As a direct and proximate result of Aetna's violations of Mich. Comp. Laws Ann. § 445.72(4), Plaintiff Banks and Michigan Subclass Members suffered damages, as described above.

421.    Plaintiff Banks and Michigan Subclass Members seek relief under Mich. Comp. Laws Ann. § 445.72(13), including a civil fine.

## COUNT 23
### MICHIGAN CONSUMER PROTECTION ACT,
### Mich. Comp. Laws Ann. §§ 445.903, *et seq.*
### (On behalf of Plaintiff Banks and the Michigan Subclass)

422.    Plaintiff Banks, individually, and on behalf of the Michigan Subclass, repeats and realleges all allegations as if fully set forth herein.

423.    Aetna, Plaintiff Banks, and each member of the Michigan Subclass are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

424.    Aetna advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

425.    Aetna engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including:

a.    Representing that its goods and services have characteristics, uses, and benefits that they do not have;

b.    Representing that its goods and services are of a particular standard or quality if they are of another;

c.    Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;

    d.   Making a representation or statement of fact material to the transaction

        such that a person reasonably believes the represented or suggested state

        of affairs to be other than it actually is;

    e.   Failing to reveal facts that are material to the transaction in light of

        representations of fact made in a positive matter.

426.    Aetna's unfair, unconscionable, and deceptive practices include:

    a.   Failing to implement and maintain reasonable security and privacy

        measures to protect Plaintiff Banks's and Michigan Subclass Members'

        Private Information, which was a direct and proximate cause of the Data

        Breach;

    b.   Failing to identify and remediate foreseeable security and privacy risks

        and adequately improve security and privacy measures despite knowing

        the risk of cybersecurity incidents, which was a direct and proximate cause

        of the Data Breach;

    c.   Failing to comply with common law and statutory duties pertaining to the

        security and privacy of Plaintiff Banks's and Michigan Subclass

        Members' Private Information, including duties imposed by the FTC Act,

        15 U.S.C. § 45, which was a direct and proximate cause of the Data

        Breach;

    d.   Misrepresenting that they would protect the privacy and confidentiality of

        Plaintiff Banks's and Michigan Subclass Members' Private Information,

        including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Banks's and Michigan Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Banks's and members of the Michigan Subclass Members' Private Information; and

g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Banks's and Michigan Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

427.   Aetna's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect the confidentiality of consumers' Private Information.

428.   Aetna intended to mislead Plaintiff Banks and Michigan Subclass Members and induce them to rely on its misrepresentations and omissions.

429.   Aetna acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Plaintiff Banks' and Michigan Subclass Members' rights.

430.   As a direct and proximate result of Aetna's unfair, unconscionable, and deceptive practices, Plaintiff Banks and Michigan Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and

expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Aetna's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

431.   Plaintiff Banks and the Michigan Subclass seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, injunctive relief, and any other relief that is just and proper.

**COUNT 24**
**NEW YORK GENERAL BUSINESS LAW**
**N.Y. Gen Bus. Law §§ 349, *et seq.***
**(On behalf of Plaintiff N. Venezia, Plaintiff V. Venezia and the New York Subclass)**

432.   Plaintiff N. Venezia and Plaintiff V. Venezia individually, and on behalf of the New York Subclass, repeats and realleges all allegations as if fully set forth herein.

433.   Defendant engaged in deceptive ats or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 394, including:

  a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff N. Venezia and Plaintiff V. Venezia's and the New York Subclass' Private Information, which was a direct and proximate cause of the Data Breach;

  b.   Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.  Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff N. Venezia and Plaintiff V. Venezia's and the New York Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiff N. Venezia and Plaintiff V. Venezia's and the New York Subclass' Private Information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff N. Venezia and Plaintiff V. Venezia's and the New York Subclass' Private Information, including duties imposed by FTC Act, 15 U.S.C. §45;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff N. Venezia and Plaintiff V. Venezia's and the New York Subclass' Private Information; and

g.  Omitting, suppressing and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff N. Venezia and Plaintiff V. Venezia's and the New York Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

434.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

435.    Defendant acted intentionally, knowingly and maliciously to violate New York's General Business Law, and recklessly disregarded Plaintiff N. Venezia and Plaintiff V. Venezia's and the New York Subclass' rights.

436.    As a direct and proximate result of Defendant's deceptive and unlawful acts and practices, Plaintiff N. Venezia, Plaintiff V. Venezia and the New York Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, ad descried herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Defendant's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Data Breach.

437.    Defendant's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large, including the many New Yorkers affected by the Data Breach.

438.    The above deceptive and unlawful practices and acts by Defendant caused substantial injury to Plaintiff N. Venezia, Plaintiff V. Venezia and the New York Subclass that they could not reasonably avoid.

439.    Plaintiff N. Venezia, Plaintiff V. Venezia and the New York Subclass seek all monetary and non-monetary relief allowed by law, including actual damages or statutory

damages of $50 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

**COUNT 25**
**NOTICE OF SECURITY BREACH FOR PERSONAL INFORMATION,**
**N.D. Cent. Code §§ 51-30-02, *et seq.***
**(On behalf of Plaintiff Ronne and the North Dakota Subclass)**

440.    Plaintiff Ronne, individually and on behalf of the North Dakota Subclass, repeats and realleges the above allegations as if fully set forth herein.

441.    Aetna is a business that owns or licenses computerized data that includes personal information, as defined by N.D. Cent. Code § 51-30-01(4). Aetna also maintains computerized data that includes PII which Aetna does not own.  Accordingly, it is subject to N.D. Cent. Code §§ 51-30-02 and 03.

442.    Plaintiff Ronne and North Dakota Subclass Members' PII includes PII covered by N.D. Cent. Code §51-30-01(4).

443.    Aetna is required to give immediate notice of a breach of a security of a data system to owners of PII which Aetna does not own, including Plaintiff Ronne and North Dakota Subclass Members, pursuant to N.D. Cent. Code § 51-30-03.

444.    Aetna is required to accurately notify Plaintiff Ronne and North Dakota Subclass Members if it discovers a security breach or receives notice of a security breach which may have compromised PII which Aetna owns or licenses, in the most expedient time possible and without unreasonable delay under N.D. Cent. Code § 51-30-02.

445.    Because Aetna was aware of a security breach, Aetna had an obligation to disclose the data breach as mandated by N.D. Cent. Code §§ 51-30-07 and 51-30-03.

446.   Pursuant to N.D. Cent. Code §51-30-07, violations of N. D. Cent Code §§ 51-30-02 and 51-30-03 are unlawful sales or advertising practices which violate chapter 51-15 of the North Dakota Century Code.

447.   As a direct and proximate result of Aetna's violations of N.D. Cent. Code §§ 51-30-02 and 51-30-03, Plaintiff Ronne and North Dakota Subclass Members suffered damages, as described above.

448.   Plaintiff Ronne and North Dakota Subclass Members seek relief under N.D. Cent. Code §§51-15-01, *et seq*., including actual damages and injunctive relief.

### COUNT 26
### NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING ACT, N.D. Cent. Code. §§ 51-15-01, *et seq.* (On behalf of Plaintiff Ronne and the North Dakota Subclass)

449.   Plaintiff Ronne, individually and on behalf of the North Dakota Subclass, repeats and realleges the above allegations as if fully set forth herein.

450.   Aetna, Plaintiff Ronne, and each member of the North Dakota Subclass is a "person" as defined by N.D. Cent. Code §51-15-01(4).

451.   Aetna sells and advertises "merchandise," as defined by N.D. Cent. Code §51-15-01(3) and (5).

452.   Aetna advertised, offered, or sold goods or service in North Dakota and engaged in trade or commerce directly or indirectly affecting the people of North Dakota.

453.   Aetna engaged in deceptive, false, fraudulent, misrepresentative, unconscionable, and substantially injurious acts and practices in connection with the sale and advertisement of merchandise, in violation of N.D. Cent. Code §51-15-01, including:

      a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Ronne's and North Dakota Subclass

Members' PII, which was a direct and proximate cause of the Data
Breach;

b. Failing to identify and remediate foreseeable security and privacy risks
and adequately improve security and privacy measures despite knowing
the risk of cybersecurity incidents, which was a direct and proximate cause
of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining ot the
security and privacy of Plaintiffs Ronne's and North Dakota Subclass
Members' PII, including duties imposed by the FTC Act, 15 U.S.C. §45,
which was a direct and proximate cause of the Data Breach;

d. Misrepresenting that they would protect the privacy and confidentiality of
Plaintiff Ronne's and North Dakota Subclass Members' PII, including by
implementing and maintaining reasonable security measures;

e. Misrepresenting that they would comply with common law and statutory
duties pertaining to the security and privacy of Plaintiff Ronne's and
North Dakota Subclass Members' PII, including duties imposed by the
FTC Act, 15 U.S.C. §45;

f. Omitting, suppressing, and concealing the material fact that it did not
reasonably or adequately secure Plaintiff Ronne's and North Dakota
Subclass Members' PII; and

g. Omitting, suppressing and concealing the material fact that they did not
comply with common law and statutory duties pertaining to the security

111

and privacy of Plaintiff Ronne's and North Dakota Subclass Members'

PII, including duties imposed by the FTC Act, 15 U.S.C. §45.

454.    Aetna's representations and omissions were material because they were likely to deceive reasonable customers about the adequacy of Aetna's data security and ability to protect the confidentiality of consumers' PII.

455.    Aetna's above-described acts and practices caused substantial injury to Plaintiff Ronne and North Dakota Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

456.    Aetna intended to mislead Plaintiff Ronne and North Dakota Subclass Members and induce them to rely on its misrepresentations and omissions.

457.    Aetna acted intentionally, knowingly, and maliciously to violate North Dakota's Unlawful Sales or Advertising Law, and recklessly disregarded Plaintiff Ronne's and North Dakota Subclass Members' rights.  Aetna's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

458.    As a direct and proximate result of Aetna's deceptive, unconscionable, and substantially injurious practices, Plaintiff Ronne and North Dakota Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their PII; overpayment for Aetna's services; loss of the value to access their PII; and the value of identity protection services made necessary by the Breach.

459.     Plaintiff Ronne and North Dakota Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, damages, restitution, treble damages, civil penalties, and attorneys' fees, costs, and disbursements.

## COUNT 27
### OHIO CONSUMER SALES PRACTICES ACT,
Ohio Rev. Code §§ 1345.01, *et seq.*
(On behalf of Plaintiff Davis and the Ohio Subclass)

460.     Plaintiff Davis, individually and on behalf of the Ohio Subclass, repeats and realleges the above allegations as if fully set forth herein.

461.     Aetna, Plaintiff Davis, and each member of the Ohio Subclass are "persons," as defined by Ohio Rev. Code § 1345.01(B).

462.     Aetna was a "supplier" engaged in "consumer transactions," as defined by Ohio Rev. Code §§ 1345.01(A) & (C).

463.     Aetna advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

464.     Aetna engaged in unfair and deceptive acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code § 1345.02, including:

    a.   Representing that the subject of a transaction had approval, performance characteristics, uses, and benefits that it did not have;

    b.   Representing that the subject of a transaction were of a particular standard or quality when they were not.

465.     Aetna engaged in unconscionable acts and practices in connection with a consumer transaction, in violation of Ohio Rev. Code § 1345.03, including:

a. Knowingly taking advantage of the inability of Plaintiff Davis and Ohio Subclass Members to reasonably protect their interest because of their ignorance of the issues discussed herein;

b. Knowing at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

c. Requiring the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

d. Knowingly making a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment.

466. Aetna's unfair, deceptive, and unconscionable acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Davis's and Ohio Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b. Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Davis's and Ohio Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

d.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Davis's and Ohio Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.  Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Davis's and Ohio Subclass Members' Private Information; and

g.  Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Davis's and Ohio Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

467.   Aetna's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect the confidentiality of consumers' Private Information.

468.   Aetna intended to mislead Plaintiffs and members of the Ohio Subclass and induce them to rely on its misrepresentations and omissions.

469.   Aetna acted intentionally, knowingly, and maliciously to violate Ohio's Consumer Sales Practices Act, and recklessly disregarded Plaintiff Davis's and members of the Ohio Subclass' rights.

470. Aetna's unfair, deceptive, and unconscionable acts and practices complained of herein affected the public interest, including the many Ohioans affected by the Aetna Data Breach.

471. As a direct and proximate result of Aetna's unfair, deceptive, and unconscionable acts and practices, Plaintiff Davis and Ohio Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Aetna's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

472. Plaintiff Davis and the Ohio Subclass seek all monetary and non-monetary relief allowed by law, including declaratory and injunctive relief, the greater of actual and treble damages or statutory damages, attorneys' fees and costs, and any other appropriate relief.

## COUNT 28
### OHIO DECEPTIVE TRADE PRACTICES ACT,
### Ohio Rev. Code §§ 4165.01, *et seq.*
### (On behalf of Plaintiff Davis and the Ohio Subclass)

473. Plaintiff Davis, individually and on behalf of the Ohio Subclass, repeats and realleges the above allegations as if fully set forth herein.

474. Aetna, Plaintiff Davis, and each member of the Ohio Subclass are a "person," as defined by Ohio Rev. Code § 4165.01(D).

475. Aetna advertised, offered, or sold goods or services in Ohio and engaged in trade or commerce directly or indirectly affecting the people of Ohio.

476.     Aetna engaged in deceptive trade practices in the course of its business and

vocation, in violation of Ohio Rev. Code § 4165.02, including:

    a.  Representing that its goods and services have approval, characteristics,

        uses, or benefits that they do not have;

    b.  Representing that its goods and services are of a particular standard or

        quality when they are of another;

    c.  Advertising its goods and services with intent not to sell them as

        advertised.

477.     Aetna's deceptive trade practices include:

    a.  Failing to implement and maintain reasonable security and privacy

        measures to protect Plaintiff Davis's and Ohio Subclass Members' Private

        Information, which was a direct and proximate cause of the Data Breach;

    b.  Failing to identify and remediate foreseeable security and privacy risks

        and adequately improve security and privacy measures despite knowing

        the risk of cybersecurity incidents, which was a direct and proximate cause

        of the Data Breach;

    c.  Failing to comply with common law and statutory duties pertaining to the

        security and privacy of Plaintiff Davis's and Ohio Subclass Members'

        Private Information, including duties imposed by the FTC Act, 15 U.S.C.

        § 45, which was a direct and proximate cause of the Data Breach;

    d.  Misrepresenting that they would protect the privacy and confidentiality of

        Plaintiff Davis's and Ohio Subclass Members' Private Information,

        including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that they would comply with common law and statutory

duties pertaining to the security and privacy of Plaintiff Davis's and Ohio

Subclass Members' Private Information, including duties imposed by the

FTC Act, 15 U.S.C. § 45;

f.  Omitting, suppressing, and concealing the material fact that it did not

reasonably or adequately secure Plaintiff Davis's and Ohio Subclass

Members' Private Information; and

478.   Omitting, suppressing, and concealing the material fact that they did not comply

with common law and statutory duties pertaining to the security and privacy of Plaintiff Davis's

and Ohio Subclass Members' Private Information, including duties imposed by the FTC Act, 15

U.S.C. § 45.

479.   Aetna's representations and omissions were material because they were likely to

deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect

the confidentiality of consumers' Private Information.

480.   Aetna intended to mislead Plaintiff Davis and Ohio Subclass Members and induce

them to rely on its misrepresentations and omissions.

481.   Aetna acted intentionally, knowingly, and maliciously to violate Ohio's Deceptive

Trade Practices Act, and recklessly disregarded Plaintiff Davis and Ohio Subclass Members'

rights.

482.   As a direct and proximate result of Aetna's deceptive trade practices, Plaintiff

Davis and Ohio Subclass Members have suffered and will continue to suffer injury, ascertainable

losses of money or property, and monetary and non-monetary damages, as described herein,

including but not limited to fraud and identity theft; time and expenses related to monitoring

their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Aetna's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

483.    Plaintiff Davis's and Ohio Subclass Members seek all monetary and non-monetary relief allowed by law, including injunctive relief, actual damages, attorneys' fees, and any other relief that is just and proper.

**COUNT 29**
**OKLAHOMA CONSUMER PROTECTION ACT,**
**Okla. Stat. Tit. 15, §§ 751, *et seq.***
**(On Behalf of Plaintiff Carter and the Oklahoma Subclass)**

484.    Plaintiff Carter individually and on behalf of the Indiana Subclass, repeats and realleges all allegations as if fully set forth herein.

485.    Defendant is a "person," as meant by Okla. Stat. tit. 15, § 752(1).

486.    Defendant's advertisements, offers of sales, sales, and distribution of goods, services, and other things of value constituted "consumer transactions" as meant by Okla. Stat. tit. 15, § 752(2).

487.    Defendant, in the course of its business, engaged in unlawful practices in violation of Okla. Stat. tit. 15, § 753, including the following:

> a.    Making false or misleading representations, knowingly or with reason to know, as to the characteristics, uses, and benefits of the subjects of its consumer transactions;

> b.    Representing, knowingly or with reason to know, that the subjects of its consumer transactions were of a particular standard when they were of another;

    c.   Advertising, knowingly or with reason to know, the subjects of its consumer transactions with intent not to sell as advertised;

    d.   Committing deceptive trade practices that deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person as defined by section 752(13);

    e.   Committing unfair trade practices that offend established public policy and was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers as defined by section 752(14).

488.   Defendant's unlawful practices include:

    a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Carter's and the Oklahoma Subclass' Private Information, which was a direct and proximate cause of the Data Breach;

    b.   Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Carter's and the Oklahoma Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

    d.   Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Carter's and the Oklahoma Subclass' Private Information, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Carter's and the Oklahoma Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Carter's and the Oklahoma Subclass' Private Information; and

g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Carter's and the Oklahoma Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

489.   Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

490.   Defendant intended to mislead Plaintiff Carter and the Oklahoma Subclass and induce them to rely on its misrepresentations and omissions.

491.   Had Defendant disclosed to Plaintiff Carter and the Oklahoma Subclass that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant was trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff and the Subclass. Defendant accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff Carter and the Oklahoma Subclass acted

reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

492.    The above unlawful practices and acts by Defendant were immoral, unethical, oppressive, unscrupulous, and substantially injurious. These acts caused substantial injury to Plaintiff Carter and the Oklahoma Subclass.

493.    Defendant acted intentionally, knowingly, and maliciously to violate Oklahoma's Consumer Protection Act, and recklessly disregarded Plaintiff Carter's and the Oklahoma Subclass' rights.

494.    As a direct and proximate result of Defendant's unlawful practices, Plaintiff Carter and the Oklahoma Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Defendant's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach.

495.    Plaintiff Carter and the Oklahoma Subclass seek all monetary and non-monetary relief allowed by law, including actual damages, civil penalties, and attorneys' fees and costs.

## COUNT 30
### PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 Pa. Cons. Stat. §§ 201-2 & 201-3, *et seq.*
### (On behalf of Plaintiff Craig and the Pennsylvania Subclass)

496.    Plaintiff Craig individually, and on behalf of the Pennsylvania Subclass, repeats and realleges all allegations as if fully set forth herein.

497.   Defendant is a "person", as meant by 73 Pa. Cons. Stat. § 201-2(2).

498.   Plaintiff Craig and the Pennsylvania Subclass purchased goods and services in "trade" and "commerce," as meant by 73 Pa. Cons. Stat. § 201-2(3), primarily for personal, family, and/or household purposes.

499.   Defendant engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its trade and commerce in violation of 73 Pa. Cons. Stat. Ann. § 201-3, including the following:

500.   Representing that its goods and services have approval, characteristics, uses, or benefits that they do not have (73 Pa. Stat. Ann. § 201-2(4)(v));

501.   Representing that its goods and services are of a particular standard or quality if they are another (73 Pa. Stat. Ann. § 201- 2(4)(vii)); and

502.   Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)).

503.   Defendant's unfair or deceptive acts and practices include:

504.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Craig the Pennsylvania Subclass' Private Information, which was a direct and proximate cause of the Data Breach;

505.   Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

506.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Craig's and the Pennsylvania Subclass' Private Information, including

duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach;

507.    Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Craig's and the Pennsylvania Subclass' Private Information, including by implementing and maintaining reasonable security measures;

508.    Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Craig's and the Pennsylvania Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

509.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Craig's and the Pennsylvania Subclass' Private Information; and

510.    Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Craig's and the Pennsylvania Subclass' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

511.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Private Information.

512.    Defendant intended to mislead Plaintiff Craig and the Pennsylvania Subclass and induce them to rely on its misrepresentations and omissions.

513.    Had Defendant disclosed to Plaintiff Craig and the Pennsylvania Subclass that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant was trusted with sensitive and valuable Private Information

regarding millions of consumers, including Plaintiff Craig and the Pennsylvania Subclass. Defendant accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff Craig and the Pennsylvania Subclass acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

514.    Defendant acted intentionally, knowingly, and maliciously to violate Pennsylvania Unfair Trade Practices and Consumer Protection Law, and recklessly disregarded Plaintiff Craig's and the Pennsylvania Subclass' rights.

515.    As a direct and proximate result of Defendant's unfair methods of competition and unfair or deceptive acts or practices and Plaintiff Craig's and the Pennsylvania Subclass' reliance on them, Plaintiff Craig and the Pennsylvania Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Defendant's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Data Breach.

516.    Plaintiff Craig the Pennsylvania Subclass seek all monetary and non-monetary relief allowed by law, including, pursuant to 73 Pa. Stat. Ann. § 201-9.2, actual damages or statutory damages of $100 (whichever is greater), treble damages, attorneys' fees and costs, and any additional relief the Court deems necessary or proper.

**COUNT 31**
**TEXAS DECEPTIVE TRADE PRACTICES—CONSUMER PROTECTION ACT**
**Texas Bus. & Com. Code §§ 17.41, *et seq.***
**(On behalf of Plaintiff Emery, Plaintiff Stone, and the Texas Subclass)**

517.    Plaintiff Emery and Plaintiff Stone individually, and on behalf of the Texas Subclass, repeats and realleges all allegations if fully set forth herein.

518.    Aetna is a "person," as defined by Tex. Bus. & Com. Code § 17.45(3).

519.    Plaintiff Emery, Plaintiff Stone and members of the Texas Subclass are "consumers," as defined by Tex. Bus. & Com. Code § 17.45(4).

520.    Aetna advertised, offered, or sold goods or services in Texas and engaged in trade or commerce directly or indirectly affecting the people of Texas, as defined by Tex. Bus. & Com. Code § 17.45(6).

521.    Aetna engaged in false, misleading, or deceptive acts and practices, in violation of Tex. Bus. & Com. Code § 17.46(b), including:

      a.  Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

      b.  Representing that goods or services are of a particular standard, quality or grade, if they are of another; and

      c.  Advertising goods or services with intent not to sell them as advertised;

      d.  Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

522.    Aetna's false, misleading, and deceptive acts and practices include:

a.   Failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs Emery and Plaintiff Stone's and Texas Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

b.   Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Emery and Plaintiff Stone's and Texas Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052, which was a direct and proximate cause of the Data Breach;

d.   Misrepresenting that they would protect the privacy and confidentiality of Plaintiffs Emery and Plaintiff Stone's and Texas Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Emery and Plaintiff Stone's and Texas Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052;

    f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs Emery and Plaintiff Stone's and Texas Subclass Members' Private Information; and

    g.   Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs Emery and Plaintiff Stone's and Texas Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Texas's data security statute, Tex. Bus. & Com. Code § 521.052.

523.    Aetna intended to mislead Plaintiff Emery, Plaintiff Stone, and the Texas Subclass and induce them to rely on its misrepresentations and omissions.

524.    Aetna's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect the confidentiality of consumers' Private Information.

525.    Had Aetna disclosed to Plaintiff Emery, Plaintiff Stone and members of the Texas Subclass that its data systems were not secure and, thus, vulnerable to attack, Aetna would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Aetna was trusted with sensitive and valuable Private Information regarding millions of consumers, including Plaintiff Emery, Plaintiff Stone, and the Texas Subclass. Aetna accepted the responsibility of protecting the data while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff Emery, Plaintiff Stone, and the Texas Subclass acted reasonably in relying on Aetna's misrepresentations and omissions, the truth of which they could not have discovered.

526.    Aetna had a duty to disclose the above facts due to the circumstances of this case, the sensitivity and extensivity of the Private Information in its possession, and the generally accepted professional standards. Such a duty is implied by law due to the nature of the relationship between consumers, including Plaintiff Emery, Plaintiff Stone, and the Texas Subclass, and Aetna because consumers are unable to fully protect their interests regarding their data, and placed trust and confidence in Aetna. Aetna's duty to disclose also arose from its:

a.   Possession of exclusive knowledge regarding the security of the data in its systems;

b.   Active concealment of the state of its security; and/or

c.   Incomplete representations about the security and integrity of its computer and data systems, and its prior data breaches, while purposefully withholding material facts from Plaintiff Emery, Plaintiff Stone and the Texas Subclass that contradicted these representations.

527.    Aetna engaged in unconscionable actions or courses of conduct, in violation of Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Aetna engaged in acts or practices which, to consumers' detriment, took advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.

528.    Consumers, including Plaintiff Emery, Plaintiff Stone, and the Texas Subclass, lacked knowledge about deficiencies in Aetna's data security because this information was known exclusively by Aetna. Consumers also lacked the ability, experience, or capacity to secure the Private Information in Aetna's possession or to fully protect their interests regarding their data. Plaintiff Emery, Plaintiff Stone, and the Texas Subclass lack expertise in information security matters and do not have access to Aetna's systems to evaluate its security controls.

Aetna took advantage of its special skill and access to Private Information to hide its inability to protect the security and confidentiality of Plaintiff Emery and Plaintiff Stone's, and the Texas Subclass' Private Information.

529.    Aetna intended to take advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, with reckless disregard of the unfairness that would result. The unfairness resulting from Aetna's conduct is glaringly noticeable, flagrant, complete, and unmitigated. The Data Breach which resulted from Aetna's unconscionable business acts and practices, exposed Plaintiff Emery, Plaintiff Stone, and the Texas Subclass to a wholly unwarranted risk to the safety of their Private Information and the security of their identity or credit and worked a substantial hardship on a significant and unprecedented number of consumers. Plaintiff Emery, Plaintiff Stone, and the Texas Subclass cannot mitigate this unfairness because they cannot undo the Data Breach.

530.    Aetna acted intentionally, knowingly, and maliciously to violate Texas's Deceptive Trade Practices-Consumer Protection Act, and recklessly disregarded Plaintiff Emery's, Plaintiff Stone's, and the Texas Subclass' rights.

531.    As a direct and proximate result of Aetna's unconscionable and deceptive acts or practices, Plaintiff Emery, Plaintiff Stone, and the Texas Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, non-monetary damages, as described herein, including but not limited to fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; loss of value of their Private Information; overpayment for Aetna's services; loss of the value of access to their Private Information; and the value of identity protection services made necessary by the Breach. Aetna's unconscionable and deceptive acts or

practices were a producing cause of Plaintiff Emery and Plaintiff Stone's, and the Texas

Subclass' injuries, ascertainable losses, economic damages, and non-economic damages,

including their mental anguish.

532.   Aetna's violations present a continuing risk to Plaintiff Emery, Plaintiff Stone,

and the Texas Subclass as well as to the public.

533.   Plaintiff Emery, Plaintiff Stone, and the Texas Subclass seek all monetary and

non-monetary relief allowed by law, including economic damages; damages for mental anguish;

treble damages for each act committed intentionally or knowingly; court costs; reasonably and

necessary attorneys' fees; injunctive relief; and any other relief which the court deems proper.

**COUNT 32**
**WASHINGTON DATA BREACH NOTICE ACT**
**Wash. Rev. Code §§ 19.255.010, *et seq.***
**(On behalf of Plaintiff Henry and the Washington Subclass)**

534.   Plaintiff Henry, individually and on behalf of the Washington Subclass, repeats

and realleges all preceding allegations as if fully set forth herein.

535.   Aetna is a business that owns or licenses computerized data that includes Private

Information, as defined by Wash. Rev. Code § 19.255.010(1).

536.   The Private Information of Plaintiff Henry and Washington Subclass Members

includes Personal information as defined by Wash. Rev. Code § 19.255.005(2) and covered

under Wash. Rev. Code § 19.255.010(1).

537.   Aetna is required to accurately notify Plaintiff Henry and Washington Subclass

Members following discovery or notification of the breach of its data security system if Private

Information was, or is reasonably believed to have been, acquired by an unauthorized person and

the Private Information was not secured, in the most expedient time possible and without

unreasonable delay under Wash. Rev. Code § 19.255.010(8).

538.     Because Aetna discovered a breach of its security system in which Private Information was, or is reasonably believed to have been, acquired by an unauthorized person and the Private Information was not secured, Aetna had an obligation to disclose the data breach in a timely and accurate fashion as mandated by Wash. Rev. Code § 19.255.010, including by identifying in the notice the types of Private Information that were subject to the breach.

539.     By failing to disclose the Aetna data breach in a timely and accurate manner and failing to provide the information required, Aetna violated Wash. Rev. Code § 19.255.010(1).

540.     As a direct and proximate result of Aetna's violations of Wash. Rev. Code § 19.255.010(1), Plaintiff Henry and Washington Subclass Members suffered damages, as described above.

541.     Plaintiff Henry and Washington Subclass Members seek relief under Wash. Rev. Code §§ 19.255.040(3)(a) and 19.255.040(3)(b), including actual damages and injunctive relief.

## COUNT 33
### WASHINGTON CONSUMER PROTECTION ACT
### Wash. Rev. Code §§ 19.86.020, *et seq.*
### (On behalf of Plaintiff Henry and the Washington Subclass)

542.     Plaintiff Henry, individually and on behalf of the Washington Subclass, repeats and realleges all preceding allegations as if fully set forth herein.

543.     Aetna is a "person," as defined by Wash. Rev. Code § 19.86.010(1).

544.     Aetna advertised, offered, or sold goods or services in Washington and engaged in trade or commerce directly or indirectly affecting the people of Washington, as defined by Wash. Rev. Code § 19.86.010 (2).

545.     Aetna engaged in unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of Wash. Rev. Code § 19.86.020, including:

546.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Henry's and Washington Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

547.    Failing to identify and remediate foreseeable security and privacy risks and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

548.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Henry's and Washington Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Washington's data security statute, F.S.A. § 501.171(2), which was a direct and proximate cause of the Data Breach;

549.    Misrepresenting that they would protect the privacy and confidentiality of Plaintiff Henry's and Washington Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

550.     Misrepresenting that they would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Henry's and Washington Subclass Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and Washington's data security statute, F.S.A. § 501.171(2);

551.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff Henry's and Washington Subclass Members' Private Information; and

552.    Omitting, suppressing, and concealing the material fact that they did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Henry's

and Washington Subclass Members' Private Information, including duties imposed by the FTC

Act, 15 U.S.C. § 45, and Washington's data security statute, F.S.A. § 501.171(2).

553.    Aetna's representations and omissions were material because they were likely to

deceive reasonable consumers about the adequacy of Aetna's data security and ability to protect

the confidentiality of consumers' Private Information.

554.    Aetna acted intentionally, knowingly, and maliciously to violate Washington's

Consumer Protection Act, and recklessly disregarded Plaintiff and Washington Subclass

Members' rights. Aetna's numerous past data breaches put it on notice that its security and

privacy protections were inadequate.

555.    Aetna's conduct is injurious to the public interest because it violates Wash. Rev.

Code Ann. § 19.86.020, violates a statute that contains a specific legislation declaration of public

interest impact, and/or injured persons and had and has the capacity to injure persons.

## COUNT 34
### DECLARATORY AND INJUNCTIVE RELIEF
**(On behalf of the Nationwide Class, or alternatively, the Subclasses)**

556.    Plaintiffs re-allege and incorporate by reference all preceding allegations as if

fully set forth herein.

557.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is

authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here,

that are tortious and violate the terms of the statutes described in this Complaint.

558.    An actual controversy has arisen in the wake of the Data Breach regarding

Aetna's present and prospective common law and statutory duties to reasonably safeguard its

customers' sensitive personal information and whether Aetna is currently maintaining data

security measures adequate to protect Plaintiffs and Class Members from further data breaches. Plaintiffs alleges that Aetna's data security practices remain inadequate.

559.    Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their sensitive personal information and remain at imminent risk that further compromises of their personal information will occur in the future.

560.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Aetna continues to owe a legal duty to secure consumers' sensitive personal information, to timely notify consumers of any data breach, and to establish and implement data security measures that are adequate to secure customers' sensitive personal information.

561.    The Court also should issue corresponding prospective injunctive relief requiring Aetna to employ adequate security protocols consistent with law and industry standards to protect consumers' sensitive personal information.

562.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, for which they lack an adequate legal remedy. The threat of another data breach is real, immediate, and substantial. If another breach at Aetna occurs, Plaintiffs and Class Members will not have an adequate remedy at law, because not all of the resulting injuries are readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

563.    The hardship to Plaintiffs and Class Members if an injunction does not issue greatly exceeds the hardship to Aetna if an injunction is issued. If another data breach occurs at Aetna, Plaintiffs and Class Members will likely be subjected to substantial identify theft and other damages. On the other hand, the cost to Aetna of complying with an injunction by

employing reasonable prospective data security measures is relatively minimal, and Aetna has a pre-existing legal obligation to employ such measures.

564.    Issuance of the requested injunction will serve the public interest by preventing another data breach at Aetna, thus eliminating the additional injuries that would result to Plaintiffs and the millions of consumers whose confidential information would be further compromised.

## **REQUEST FOR RELIEF**

Plaintiffs, on behalf of all others similarly situated, request that the Court enter judgment against Aetna including the following:

A.    Determining that this matter may proceed as a class action and certifying the Classes asserted herein;

B.    Appointing Plaintiffs as representative of the applicable Classes and appointing Plaintiffs' counsel as Class counsel;

C.    An award to Plaintiffs and the Classes of compensatory, consequential, statutory, restitution, and treble damages as set forth above;

D.    Ordering injunctive relief requiring Aetna to, among other things: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems; (iii) provide several years of free credit monitoring and identity theft insurance to all Class Members; (iv) timely notify consumers of any future data breaches; and (v) delete or destroy any legacy consumer data that it is not necessary to keep for business purposes;

E.    Entering a declaratory judgment stating that Aetna owes a legal duty to secure its student loan borrowers' sensitive personal information, to timely notify consumers of any data

breach, and to establish and implement data security measures that are adequate to secure

sensitive personal information;

      F.     An award of attorneys' fees, costs, and expenses, as provided by law or equity;

      G.    An award of pre-judgment and post-judgment interest, as provided by law or

equity; and

      H.    Such other relief as the Court may allow.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury for all issues so triable.

                        Respectfully submitted,

DATED: June 15, 2023      */s/ Ian W. Sloss*_____
                                Ian W. Sloss

                                Steven L. Bloch
                                Johnathan Seredynski
                                Brett Burgs
                                **SILVER GOLUB & TEITELL LLP**
                                One Landmark Square, Floor 15
                                Stamford, Connecticut 06901
                                Telephone: (203) 325-4491
                                Fax: (203) 325-3769
                                isloss@sgtlaw.com
                                sbloch@sgtlaw.com
                                jseredynski@sgtlaw.com
                                bburgs@sgtlaw.com

                                Joseph P. Guglielmo
                                Erin G. Comite
                                **SCOTT+SCOTT ATTORNEYS AT
                                LAW LLP**
                                The Helmsley Building
                                230 Park Avenue, 17th Floor
                                New York, NY 10169
                                Telephone: (212) 223-6444
                                Facsimile: (212) 223-6334
                                jguglielmo@scott-scott.com
                                ecomite@scott-scott.com